THE STATE ex rel. RODES, Game and Fish Warden, v. WARNER, County Treasurer.

**In Banc, June 20, 1906.**

1.  **FINES: Belong to School Fund: Game and Fish Law.** The fines authorized to be imposed for a violation of the Game and Fish law of 1905 belong to the school fund, and section 64 of that act, requiring all such fines to be paid into the State Treasury to be applied in meeting the expenses of enforcing the law, is in conflict with section 8 of article 11 of the Constitution, which requires all penalties and forfeitures collected in the several counties for any breach of the penal or military laws of the State to be added to the county school fund, and such fines when collected must be added to that fund.

2.  ————: ————: ————: **Qui Tam Action.** An action brought in the name of the State, charging one with a violation of the Game and Fish law, which is by the act made a misdemeanor, is in no sense a *qui tam* action, although that act says that the fines collected for violations thereof shall be turned into the State Treasury to be used in meeting the expenses of its enforcement. A *qui tam* action is a civil action, brought by an informer, under a statute which provides that a part of the penalty affixed by the act for its violation shall go to him and the balance to the State or some other institution.

3.  ————: **Qui Tam Actions: Constitutional Provision Not Applicable.** The Constitutional provision declaring that "the clear proceeds of all penalties and forfeitures collected for any breach

of the penal or military laws" shall go to the county school fund, does not apply to *qui tam* actions, nor are penal statutes leveled merely at a violation of private rights wherein a private person is nominated as entitled to sue for and recover the penalties fixed for their violation, of the character referred to in that constitutional provision. But that provision does apply where fines and penalties are prescribed for crimes and are recovered by public authority, and is an inhibition upon the power of the General Assembly to divert the fines and penalties collected in such cases from the county school fund.

4. ———: ———: **Game and Fish Act.** Prosecutions for a violation of the Game and Fish act of 1905 are in no sense *qui tam* actions, but by the act itself are made criminal prosecutions by public authorities.

## Mandamus.

PEREMPTORY WRIT DENIED.

*Barnett & Barnett* for relator.

(1) The provision of the said act requiring fines collected thereunder to be paid into the Game Protection Fund instead of to the school fund, is constitutional. A legislative act is not to be declared void unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt. State v. Layton, 160 Mo. 474. An infraction of the Constitution must be plain and obvious to be fatal to the act. State v. Whitaker, 160 Mo. 59; Sutton v. Phillips, 116 N. C. 502. (2) Section eight of article eleven of the Missouri Constitution provides that the "clear proceeds" of all forfeitures and penalties and of all fines collected shall belong to the school fund. In this instance there are no clear proceeds. All of the fines collected are used under the provision of the act in question for the enforcement and carrying out of the provisions of the said game law, leaving no proceeds resulting from said act after the payment of the expenses of the enforcement of the act itself. The meaning of the con-

stitutional provision just cited is that all fines and penalties recovered where the legislative enactment does not otherwise provide shall go to the school fund. In most cases where a fine is imposed for the violation of a law there is no express provision as to where the fine shall go. It belongs to the State at large. The Constitution in such case directs that such fines shall go to the school fund. But the enactment of penal laws and the imposition of fines and penalties is a matter which the Constitution has confided to the Legislature. The Constitution itself does not prescribe what penalties shall accrue to the State. That is a matter left to the Legislature. Such penalties only as the Legislature provides shall accrue to the State, that is, to the State at large without any limitation, go to the county school fund, but the Legislature may provide that these penalties be paid for the enforcement of the law or be paid to an individual to induce the enforcement of a law or be paid elsewhere in furtherance of any police regulation of the State. Scott v. Railroad, 38 Mo. App. 528; Barnett v. Railroad, 68 Mo. 63; Sutton v. Phillips, 116 N. C. 502; State ex rel v. Sams, 99 N. W. 543; Katzenstein v. Railroad, 84 N. C. 693. The Legislature as a part of the police regulation of the State notwithstanding the constitutional provision in question could enact that the entire penalty for the violation of a law should be paid to an individual, to an informer, in order to stimulate that individual to enforce the law. Sutton v. Phillips, 116 N. C. 504. Then for a much stronger reason could the Legislature provide, as in this case, that the fines imposed by the act called the game law should be paid into a game protection fund in order to enforce and carry out said law. (3) Independent of the act itself there would have been no fines or penalties and if this Game Protection Fund is deprived of the revenue provided by the act itself, then the whole act must fall for want of support because you take from the act itself its very means of existence.

And if you destroy the act, of course the school fund would be in no better condition than now.

*John A. Sea* for respondent.

(1) The act creating the Game Protection Fund, so far as it appropriates fines and penalties, imposed for violation of said act, for the use of said Game Protection Fund, is unconstitutional and void. (2) The offense for which Weber was punished by a fine is, by section 4 of the game law, declared to be a misdemeanor; if convicted under section 15 or 16 of said act, it was still declared to be a misdemeanor by the terms of said act. The prosecution for the violation of the game law "may be . . . either by indictment, complaint or information." Sec. 25, Game Law, Laws 1905, p. 163. Being so declared a "misdemeanor" by statute, the State alone could prosecute Weber, and then only by indictment or information. Sec. 12, art. 2, Mo. Constitution.. And Weber, so prosecuted, was prosecuted "criminally." Sec. 12, art. 2, Mo. Constitution. The Governor had power to grant any commutation or pardon of any violation of this law after conviction. Sec. 8, art. 5, Mo. Constitution. The game law recognizes this, and expressly provides either for full payment of fine and costs, or imprisonment in county jail for term, or release "upon the order of the Governor of this State." Sec. 23 Game Law, Laws 1905, p. 163. Being punishable, in the name of the State on information or indictment only, by a "fine," the violation of the law by Weber was "a crime" or "criminal offense." Sec. 2396, R. S. 1899; State v. Blitz, 171 Mo. 540. And the arrest and conviction of Weber was a "criminal proceeding." U. S. v. Huen, 118 Fed. 455. Being a "crime" it was an offense against the public or State, and the fine imposed was a punishment. Gorman v. Budlong, 23 R. I. 169. A statute, in imposing a punishment, on information or in-

dictment in the name of the State for an offense against the state or public, which punishment, or conviction, the Governor had power to commute, or to pardon the offense, makes the act in question a "penal law" of this State. Huntington v. Attrill, 146 U. S. 657; Brady v. Daly, 175 U. S. 148; City of Atlanta v. Chattanooga F. & T. Works, 127 Fed. 23; State v. Hardman, 16 Ind. App. 357; Kilton v. Providence Tool Co., 22 R. I. 605; People v. Common Council, 36 Mich. 186; Railroad v. State, 22 Kan. 15; Cullian v. Burkhard, 84 N. Y. Supp. 828. (3) The county court is the trustee of county school fund, and, as such, has the sole management and control thereof. Secs. 9824, 9826, R. S. 1899.

LAMM, J.—In 1905 the General Assembly of the State of Missouri passed an act entitled "An Act relating to the preservation, propagation and protection of game animals, birds and fish; creating the office of game and fish warden; creating a game protection fund, and appropriating money therefrom," in 71 sections. [Laws 1905, p. 158.]

By section 38, it is provided that the Governor shall "appoint some person skilled in matters relating to birds, game and fish, a resident of the State, game and fish warden." And this official is put under bond and given large powers and multiplied duties. Thereafter the Governor selected relator as "skilled in matters relating to birds, game and fish," and duly appointed and commissioned him to the office of game and fish warden, he qualifying as such, taking upon himself the burden of said duties and powers.

By section 66, it is provided that "moneys collected from fines, penalties or forfeitures, under this act, belonging to the game protection fund, shall be paid over by the officer authorized to collect said money to the State Treasurer on or before the first day of each month."

By section 64, it is enacted that "all moneys sent

to the State Treasurer in payment of . . . fines, penalties, forfeitures, shall be set aside by the State Treasurer and shall constitute a fund, known as the 'Game Protection Fund,' for the payment of the salary of the state game and fish warden, his necessary expenses, also for the payment of deputy game and fish wardens and their necessary expenses.''

By other sections, the game and fish warden is authorized to appoint deputies for each Congressional district, and, furthermore, by section 53, ''all sheriffs, deputy sheriffs, marshals, constables or other peace officers, are declared to be *ex officio* game and fish wardens.'' The act bristles with impaling provisions, the violation of which are denounced, *seriatim,* as misdemeanors, to be punished as criminal offenses by fines (and by imprisonment, in case the fines are not paid), ranging from $5 to $1,000, and the scheme is that all these fines should be paid to the State Treasurer to swell the corpus of the ''Game Protection Fund,'' out of which fund comes the expenses of enforcing the law.

At a certain time, one Weber was convicted before a justice of the peace in Jackson county of a misdemeanor for violating one of the provisions of said act, and was mulcted in a fine of $50, which he paid. This fine was turned over to respondent, Warner, as county treasurer of Jackson county, who credited the same to the school fund of that county. Whereat relator brought this original proceeding to compel, by the moving writ of mandamus, said county treasurer to turn over said fine to the State Treasurer to be by him credited to the ''Game Protection Fund.''

An alternative writ issued, directed to respondent, requiring him to pay over said $50 to the State Treasurer for the use of said fund, or show cause why he has not so done. To this alternative writ, respondent made return interposing divers grounds as ''cause'' for not obeying our writ. The only cause, deemed of consequence, is that whereby the constitutionality of those

provisions of the act requiring such fines to be converted into the state treasury and into said fund is challenged. It is insisted said provisions violate section 8, article 11, of our Constitution, reading thus:

"All . . . , the clear proceeds of all penalties and forfeitures, and of all fines collected in the several counties for any breach of the penal or military laws of the State . . . , shall belong to and be securely invested and sacredly preserved in the several counties as a county public school fund; the income of which fund shall be faithfully appropriated for establishing and maintaining free public schools in the several counties of this State."

On the coming in of this return, relator demurred thereto. Thereby the question submitted becomes one of law and the issue will be treated as single and sharply defined as pointed out.

Does the statutory disposition of these fines impinge upon the state Constitution? That is the question here, and, in our opinion, that question must be answered in the affirmative. It is with judicial reluctance we are constrained to this notion; for the law is a wholesome one. The mischiefs struck at and to be retarded are manifest; the benefits in view and to be advanced, many and salient; and, in so far as this holding tends to emasculate the law and defeat its purposes (if so it results) by reducing somewhat the fund for its enforcement, it becomes a matter of pronounced solicitude and gravity. Before any provision of a statute may be declared unconstitutional, the courts should allow full play to all wise rules and maxims of construction and interpretation—*inter alia,* that its unconstitutionality should be so palpable and obvious as to leave no room for reasonable doubt in the court's mind. [State v. Layton, 160 Mo. l. c. 499.] Another unbending rule is that a state legislature (in contrast to the federal Congress) has all legislative power not prohibited to it by the state or federal Constitution. [State

ex rel. v. Sheppard, 192 Mo. 497; Cass County v. Jack, 49 Mo. l. c. 199.] But considering, as we are bound to consider, the constitutional provision, *supra,* as imperious, as written by plain men in plain language for a plain and high purpose; and approaching, as our duty is, the legislation in question without judicial austerity or over-refinement of interpretation, we have been able to arrive at no other conclusion than that fines arising from punishment of violators of the act in question, like all other fines arising from punishment inflicted by the criminal law, are devoted to a constitutional purpose of inflexible stiffness, to-wit, the education of the little ones, the children, of Missouri.

And this is so, because:

I. In the first place it is argued by the learned counsel of relator that penal laws may be enforced for the benefit of individuals; that public policy, as chrystallized in the law, permits *qui tam* actions; and further, that, when the gist and scope of the legislation in hand is considered, it is apparent it was passed for a specific purpose, to-wit, the protection of game, and to create a specific fund, to-wit, the Game Protection Fund —*ergo,* relator says, in effect, it may stand on the theory that legalizes a *qui tam* action, or that legalizes the collection of a penalty for the benefit of a private person or for a local object. On this insistence, we are referred to Barnett v. Railroad, 68 Mo. 56, where a penal statute was under consideration giving to a stock-owner double damages for killing stock, when a railroad remained unfenced contrary to law, and in which case the point was made that the statutory penalty under the Constitution could not go to the stock-owner, but inured to the benefit of the school fund, and, hence, the statute was void. In that case the law was held constitutional, and the penalty of double damages, it was held, might go to the stock-owner. In considering the constitutional provision now in hand, HOUGH, J., speak-

ing for this court, said: "This section clearly refers to penalties accruing to the public, and not to penalties recovered by private persons for their own use." [l. c. 64.]

In Kaes v. Railroad, 6 Mo. App. l. c. 405, the same constitutional provision was interposed as a defense in an action under the statute for double damages for killing stock, and LEWIS, P. J., said for that court: "The constitutional provision . . . whereby 'the clear proceeds of all penalties and forfeitures' are directed to go into the public school fund, evidently applies only to penalties and forfeitures actually collected by the public county authorities."

Scott v. Railroad, 38 Mo. App. 523, is relied upon by relator. That was an action for damages and a penalty for failure to cause all the dead or dry vegetation and undergrowth to be removed off defendant's railroad right of way or burned twice in each year, to prevent the spread of fire and the destruction of property. In that case, it was contended plaintiff was not entitled to the penalty because of the constitutional provision now under consideration, and it was held that the law giving him the penalty was constitutional.

In further illumination of the matter, the language of Justice GRAY in Huntington v. Attrill, 146 U. S. 657, is in point, as showing the intrinsic differences existing in penal laws and the distinction to be observed. That was a case where, by a bill in equity lodged in a Maryland court, it was sought to enforce the payment of a judgment recovered by plaintiff in the State of New York under a penal statute. A defense was interposed based on Chief Justice MARSHALL's maxim, that "the courts of no country execute the penal laws of another." [The Antelope, 10 Wheat. 66, 123.] The necessities of that case required a consideration of penal laws in general, and a gloss of the words "penal" and "penalty," and Justice GRAY said:

"In the municipal law of England and America,

the words 'penal' and 'penalty' have been used in various senses. Strictly and primarily, they denote punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offense against its laws. [United States v. Chouteau, 102 U. S. 603, 611.] But they are also commonly used as including any extraordinary liability to which the law subjects a wrongdoer in favor of the persons wronged, not limited to the damages suffered. They are so elastic in meaning as even to be familiarly applied to cases of private contracts, wholly independent of statutes, as when we speak of the 'penal sum' or 'penalty' of a bond. In the words of Chief Justice MARSHALL: 'In general, a sum of money in gross, to be paid for the nonperformance of an agreement, is considered as a penalty, the legal operation of which is to cover the damages which the party, in whose favor the stipulation is made, may have sustained from the breach of contract by the opposite party.' [Tayloe v. Sandiford, 7 Wheat. 13, 17.]

"Penal laws, strictly and properly, are those imposing punishment for an offense committed against the State, and which, by the English and American constitutions, the executive of the State has the power to pardon. Statutes giving a private action against the wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal."

In construing the Trespass Act (R. S. 1899, chap. 60) where treble damages may be recovered for certain forms of trespass, and which damages are treated *eo nomine* as "penalties," and in one section of which (sec. 4574) it is provided that the penalty may be recovered either by civil action or by indictment or information at the option of the party injured, and by another section of which (sec. 4577) defendant might be imprisoned for not paying a civil judgment under that act, the constitutionality of those provisions was

brought in question in Blewett v. Smith, 74 Mo. 404, but the constitutional objection (to-wit, that sec. 8, art. 11, was impinged upon) was disallowed. It was, however, pointed out that the act was intended for the benefit of the owner of the property injured and was constitutional under the authority of Barnett v. Railroad, supra. It may be said, in passing, that even under the Trespass Act where the penalty is recovered by indictment, such penalty shall be paid into the county treasury (sec. 4574), and, of course, became a part of the county school fund.

State ex rel. Clay County v. Railroad, 89 Mo. 562, was an action under a statute providing for a penalty for not ringing a bell or sounding a whistle at a certain public crossing. That statute gave one-half the penalty to the informer and the other half went to the county, and the same statute has been brought forward in later revisions as live law. [See R. S. 1899, sec. 1102.] A defense was interposed that the penalty under the Constitution belonged to the school fund, and, hence, the statute was void. It will be instructive to read that case in connection with the point now under consideration in the case at bar. Because, it will be observed, the Constitution refers to the "clear proceeds" of fine and penalties, and the learned judge who wrote that opinion construed "clear proceeds" to mean, as applied to that case, the one-half given by the statute to the county. It will not be space misapplied, nor labor lost, to quote from that case, thus:

"It is only the 'clear proceeds of the penalties' collected in the several counties for breaches of the penal laws of the State that belong (with the other funds specified) to the several counties under this constitutional provision. The Legislature, in imposing penalties for violation of its laws, may, in its discretion, for the purpose of securing the enforcement of said laws, the collection of the penalties imposed, and paying the expenses thereof, give a part thereof to an informer,

and in such case what is thus realized constitutes the 'clear proceeds of said penalties,' within the meaning of section 8, article 11, of the Constitution, supra. [Barnett v. Railroad, 68 Mo. 56.] It follows, therefore, that section 806 is not unconstitutional, as claimed by defendant.''

The same statute was again under review with the same constitutional point raised, in State ex rel. v. Railroad, 149 Mo. 104, and the same disposition was made of the point, under the authority of the foregoing case.

Another case is somewhat in point, State v. Clifford, 124 Mo. 492. That was a proceeding on *scire facias* to collect a judgment of forfeiture on a recognizance in a criminal case. The prosecuting attorney had collected the costs and the 10 per cent on the judgment of forfeiture allowed him as attorney's fees by law, and thereafter undertook to forgive and release the 90 per cent of the judgment of forfeiture due the State for the school fund. It will be seen that in the provision of the statute allowing prosecuting attorneys to deduct 10 per cent of this penalty or forfeiture, the question of what is the ''clear proceeds'' is involved. The remarks of GANTT, J., speaking for this court, are of value on that point and also on the question presently under consideration. That judge there said:

''Had the circuit attorney authority to satisfy and discharge the forfeiture, upon the defendant's payment of the court fees and a commission of ten per cent on the amount of the recognizance? This is a question of great practical importance. By section 8 of article 11 of the Constitution of this State, 'the clear proceeds of all penalties and forfeitures, and all fines collected in the several counties for any breach of the penal or military laws of the State' shall belong to and be securely invested and sacredly preserved in the several counties as a county public school fund. By section 637, Revised Statutes 1889, it is the duty of all prosecuting attorneys to 'prosecute forfeited recognizances and ac-

tions for the recovery of debts, fines, penalties and forfeitures accruing to the State or county,' and by section 4981 they are allowed fees therefor as follows: 'For collections on recognizances given to the State in criminal cases, and which are or may become forfeited, ten per cent on all sums collected, if not more than $500, and five per cent on all sums over $500, to be paid out of the amount collected.'

"It will thus appear that the people of this State have in the most solemn form set aside all fines and forfeitures as a. part of the school fund and by statutes enjoined upon all prosecuting attorneys the duty of collecting these forfeitures, and as an incentive to diligent service in so doing, in addition to the salaries and fees otherwise allowed by law to those officers, a commission of ten or five per cent, as the case may be, is added 'to be paid out of the amount collected.' Surely, in view of the importance attached to them, both in the Constitution and statute, *it was never intended that these recognizances and forfeitures should be used merely to furnish fees for the prosecuting attorneys, and the purpose to which they were, by the Constitution, devoted, entirely ignored.*"

The Supreme Court of Michigan had occasion to examine and deliver a pronouncement upon a similar question. Certain parties were fined by a municipal court in Bay City for a violation of city by-laws. Thereat the county treasurer of Bay county sued out a writ of mandamus to compel the city authorities to pay over such fines; and, as grounds for the writ, contended, under a constitutional provision that "all fines assessed and collected in the several counties and townships for any breach of the penal laws" shall be exclusively applied to the support of libraries, the city was not entitled to these fines, but they should go to him for library purposes. CAMPBELL, J., in considering and disallowing that contention, said (Fennell v. Common Council, 36 Mich. l. c. 189):

"The laws then and since have recognized a distinction between penal forfeitures for the violation of the laws of the State for the preservation of the public order and enforced by the State authorities, and the multitudinous forfeitures under contracts, taxes, highway laws and other statutes, where a liability arises to incur penalties to the State or local interests or private parties aggrieved, where the omissions of duty have not been treated as coming within the category of criminal conduct, but partake of the nature of a civil grievance or of a merely local wrong."

What is *qui tam* action? Black defines it (Black's L. Dic., Tit. *Qui Tam*) thus: "Lat. 'Who as well ——.' An action brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the State or some other institution, is called a '*qui tam* action;' because the plaintiff states that he sues *as well* for the State as for himself." This definition should not be lost sight of in considering the case at bar; because relator relies to some extent upon legal principles enunciated in *qui tam* actions, or in actions of a similar sort, sustained upon similar principles. For instance, stress is laid by counsel on Sutton v. Phillips, 116 N. C. 502, and Katzenstein v. Railroad, 84 N. C. l. c. 693. It should be said of those cases that the reasoning employed must be understood and applied in the light of the facts there in judgment; and, as to the facts in judgment, it may be said both of those cases are somewhat similar in character to Scott v. Railroad, 38 Mo. App. supra; Blewett v. Smith, 74 Mo. supra; Barnett v. Railroad, 68 Mo. supra, and some other Missouri cases hereinbefore considered, and which Missouri cases are referred to as authority by the North Carolina court.

From the foregoing authorities, we deduce proposi-

tions pertinent to this case, it seems to us, and which may be formulated guardedly, as follows:

(a)  Where penal statutes are merely leveled at a violation of private rights, and a private person or class of persons is nominated therein as entitled to sue for and recover penalties arising from the violation of such statutes for their own use, then such penal laws are not of the character of penal laws referred to in section 8, article 11, of the Constitution, and the penalties provided in such laws are not devoted by the Constitution itself to the public school fund.

(b)  And where penalties such as are referred to in the foregoing hypothesis may be recovered by a *qui tam* action — a civil action — a part may go to the informer and the other part may be devoted to the purposes prescribed by statute law. [And in this connection it may be well to note our austere legislative policy relating to *qui tam* actions. For example (R. S. 1899, sec. 1542): "In all . . . *qui tam* actions, actions on penal statutes where the penalty is given to the informer . . . the plaintiff or person for whose use the action is to be commenced shall, before he institutes such suit, file with the clerk of the court in which the action is commenced the written undertaking of some person," etc., to secure the payment of costs.]

(c)  But where fines and penalties are prescribed as a punishment for a violation of public wrongs, *i. e.,* *crimes,* and such penalties or fines are to be recovered by public authority, the disposition of such recovered fines or penalties comes within the constitutional provision under consideration, and they may not be turned awry from the prescribed constitutional course.

(d)  And under the last hypothesis, the question of "clear proceeds" confronts us. It seems (though that question is not in this case and is not decided) that a criminal statute might devote a reasonable portion of recovered fines and penalties by way of incentive or spur to officers in collecting them and enforcing

the law; and that, after such appropriation of a part, the part remaining might be considered "clear proceeds" under the Constitution, and go to the public school fund in obedience to, and full satisfaction of its mandate.

II. The legislation in hand is not the first wherein an attempt was made to quite divert the pecuniary results of the criminal enforcement of the law from the public school fund and into the State treasury. In 1895 (Laws 1895, p. 26) the General Assembly passed an act entitled "An Act prohibiting the coloring yellow of any substance designed to be used as a substitute for butter; to prohibit the manufacture, sale, keeping for sale and fraudulent use of substances designed as imitation butter; to regulate the manufacture, sale and keeping for sale of any substance designed to be used as a substitute for butter, and making an appropriation for carrying out the provisions of this act." By sections 7 and 10, violations of the act were made misdemeanors. Section 11 reads as follows:

"The State Board of Agriculture shall be and is hereby charged with the enforcement of this act. There is hereby appropriated to the State Board of Agriculture, out of any money not otherwise appropriated, the sum of five thousand dollars for the next biennial period, or so much thereof as may be necessary for the enforcement of this act: Provided, that all fines collected under the provisions of this act shall be covered into the State treasury. Actions under this act shall be brought in any court of competent jurisdiction."

The constitutionality of that act was assailed in this court in two cases, State v. Newell, 140 Mo. 282, and State v. Bockstruck, 136 Mo. 335, and one point made was that fines, levied against convicted violators, must, under section 8 of article 11 of the Constitution, go into the county treasury for the benefit of the school fund, and may not be covered into the State treasury.

The section of the law diverting these fines from the public school fund was, in effect, ignored and treated as unconstitutional, and the act otherwise upheld.

III. The history of our State legislation on the preservation of fish and game is somewhat curious and not without significance on the question being considered. The constitutional provision in hand was substantially borrowed from the Constitution of 1865 and the plan of devoting fines, penalties and forfeitures (arising from the violation of "penal laws") to a free public school fund seems to have originated in the latter instrument. Before such Constitution was adopted, the legislative mind considered fish, at least. So far as the investigation of the writer goes, statutory enactments intended to aid in the preservation of the supply of fish, appeared first in the Laws of 1860-1, p. 31. That act related to the erection of seines, nets, fishdams and other obstructions in the waters of the State in such a way as to "obstruct the passage of fish up and down or through such waters or streams." In other words, fish, *sub modo*, were allowed by law to swim wherever whim or instinct, pleasure or business, called. Moreover it is provided therein that any person violating the law shall be arrested on complaint and a justice was to hear the case in a "summary manner," and any person found guilty, for the first offense, was to be fined not less than five or more than twenty dollars; for the second offense the fine might be doubled. The act speaks of the prosecution as a "suit" and provides that one-half the fine should go to the "common school fund of such county" and the other half should be paid the informer. If the fine was not paid, the offender was committed to jail. This act seems to have been carried forward into the revision of 1865 and into Wagner's Statutes.

In 1874 the Legislature passed an act entitled, "An Act for the preservation of game, animals and fish."

[Laws 1874, p. 108.] Violations of the law were made misdemeanors and fines inflicted therefor inured to the public school fund. [Sec. 7.] The same Legislature passed an act entitled, "An Act to prevent the destruction of fish." [p. 114.] A violation of certain provisions of the last-mentioned law was made a felony to be punished by confinement in the penitentiary not exceeding three years. Violation of other provisions was made a misdemeanor, and a person convicted thereof was mulcted in a fine not exceeding $500. The legislative mind did not act upon the disposition of such fines, but they were left to take the constitutional course.

In 1877 the Fish Act of 1874 was repealed (Laws 1877, p. 330) and in lieu thereof a new law was passed making violations of its provisions misdemeanors and giving informers, in case of successful prosecution and recovery of fine, one-half of the amount recovered — the remainder, presumably, to take the constitutional course. The same Legislature passed a new act for the preservation of game, animals, etc., making violations thereof misdemeanors and providing that one-half of the collected fines should be paid into the public school fund of the county and the other half to the informer. These laws were carried forward into the revision of 1879, 1889, and 1899, with but small change — the disposition of fines remaining the same.

Carried forward with the act of 1877, in the aforesaid revisions, was an act passed in 1879, entitled, "An Act for the propagation and protection of foodfishes in the waters of the State of Missouri, and to appropriate money therefor." [Laws 1879, p. 153.] This latter act made sundry violations misdemeanors and provided that one-half of the fines should be paid to the informer, the other half, presumably, to take the constitutional course. [R. S. 1879, secs. 1612-1634; R. S. 1889, secs. 3899-3919; R. S. 1899, secs. 2301-2320; in the last-named revision certain amendatory acts are includ-

ed, but the disposition of the fines remains as in the act of 1877.]

In all these statutes, the foregoing provisions of law are carried forward under the head of "crimes;" and it will be seen that the Legislature, prior to the act of 1905, apparently kept the Constitution in mind and proceeded on the theory that part of the fine might be disposed of to aid in the enforcement of the law, but that a certain portion, as "clear proceeds," should take the constitutional course of swelling the corpus of the public school fund. It was reserved for that act, by one stroke, to leave no "clear proceeds" for the school fund, but appropriate all to aid in the enforcement of the law and payment of official salaries.

IV. Finally, if the act of 1905 be critically examined, it will be seen that it holds the penalties of naked criminal law *in terrorem* over the heads of all offenders. In addition to what has been said heretofore on this score, it will be found that at least twenty-five distinct classes of misdemeanors are created, and, in each class, by the use of disjunctives and other *minutiae* of details, its provisions are so framed as to create a swarm of offenses, defined as misdemeanors, to be punished as such on prosecutions by indictment and information, under supervision of prosecuting attorneys, aided by game and fish wardens, and the whole act bristles with the terminology of a criminal law, somewhat Draconian in severity. For instance, the Governor has the pardoning power by one section. By another section, if a convicted offender does not pay his fine he may be imprisoned in the county jail. By another, the prosecuting wardens are relieved from giving security for costs. By another, these wardens are allowed their fees as a cost perquisite. By another, the whole staff of bailiffs in the State are made *ex officio* wardens. By another, the power is given wardens to serve criminal process, to summon a *posse comitatus,*

and (presumably) to raise the hue and cry. We take it, in case of a conviction of an insolvent offender the respective counties would be liable for costs, and, if the offender be imprisoned in the county jail, the respective counties would be liable for board. These prosecutions are confessedly in no sense *qui tam* actions but are made criminal prosecutions by public authorities in the stiffest and most obstinate and precise sense.

In view of the foregoing, for this court to hold that the lawmaking power may ignore, as it has done, the imperative mandate of the Constitution relating to the disposition of fines collected for the breach of the penal law under review, would be in contravention of recognized and long-established rules of interpretation, and would lodge a power in the Legislature to, by mere amendments to our existing criminal laws, deplete the public school fund by drying up one of its constitutional sources of supply.

A peremptory writ of mandamus is, therefore, denied, and the present rule discharged.

All concur.