STATE of Missouri ex rel. Bob G. WAT-
KINS (Relator), Respondent,

v.

Robert H. CASSELL and Roy Paul
(Respondents), Appellants.

No. 29431.

St. Louis Court of Appeals.
Missouri.

Sept. 18, 1956.

Rehearing Denied Nov. 13, 1956.

**648** ■ 

corporation. Respondent Robert H. Cassell is president, and respondent Roy Paul is vice-president, secretary and treasurer of said company. The latter is also general manager. The trial court, after a hearing, issued its peremptory writ directing respondents to produce and exhibit to relator all books and records of said corporation for his inspection, and to permit relator to make copies thereof with the aid and assistance of expert accountants, stenographers and attorneys of his choice. The court also assessed a penalty of $250 against respondent Cassell in favor of relator. From the judgment, respondents have appealed. In order to avoid confusion we will hereafter refer to Bob G. Watkins as relator, and to respondents Cassell and Paul as appellants.

Relator was one of the original incorporators of the company and owns approximately twenty-five per cent of its stock. He has been a director since its organization in 1949. Prior to January, 1954, he also served as vice-president and secretary of the company and actively participated in the management. He resigned from office so that he might devote his full time to his work as a commercial artist. Appellant Cassell owns approximately fifty-five per cent of the stock of the company. He also was one of the original incorporators and has been president of the company since its organization. Appellant Roy Paul owns approximately twenty per cent of the stock of the company. He has been an officer of the company since 1953. The books and records were under the control of appellants.

Dubail & Judge, Charles R. Judge, St. Louis, for appellants.

Cady & Carmody, George W. Cady, Thomas W. Carmody, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is a proceeding in mandamus wherein relator, Bob G. Watkins, seeks an examination of the books and records of Cassell, Watkins, Paul, Inc. Relator is a minority stockholder and director in said corporation is engaged in business as a commercial art studio. Relator is an artist and does work for the corporation on a "free-lance" (independent contractor) basis. He maintains a studio at the company's place of business and also at his home, and works at both places. About fifty per cent of his work is performed at each place. Other artists are engaged at the studio, some of whom are employees, others are independent contractors. These

artists work at the company's place of business and in studios in their homes.

Relator testified that up to the end of 1954 monthly financial statements of his account with the corporation had been furnished him and that he had had complete access to the records whenever he wanted to see them. No financial statements had been furnished him since the first of the year 1955. On March 8, 1955, relator went to Mr. Paul's office. Both Mr. Paul and Mr. Cassell were in the office at the time. Relator asked them if it was possible for him to inspect the records of the company. Appellants informed relator that he could not inspect the records, and that all the information he could have was the amount of his earnings during the month. Relator then requested Mr. Cassell to put this denial in writing. Mr. Cassell complied with this request and gave relator the following memorandum:

"Memo to Bob Watkins:

"Your request to examine our company books, at any reasonable hour during the day, as a director of the company, is certainly granted you, as you must know. Subject to the restriction only that such examination be made in the presence of an officer of the company. Your request to transcribe this information, under our present circumstances, must be denied you. However, balance sheets showing the condition of the company and a statement of your account will be furnished you monthly, as in the past. Because of our strained relationship it was decided that all records and papers of company business should remain in my office. We feel it is necessary to use a reasonable restriction on copying that divulge trade secrets, artists comparison of income, incomes of salaried personnel, etc., which the directors of our company feel would stir up unrest within our studio group.

"R. H. Cassell."

This written response to relator's demand was not satisfactory to relator, and this action was commenced March 17, 1955.

In their return appellants alleged that they had not at any time denied relator the right to inspect the books and records of the corporation, but had informed relator that they would not permit the copying of certain records containing information of a confidential nature, relating to clients' accounts, distribution of compensation as between artists, and military work of a secret nature. It was then averred:

"Respondents state that they have imposed the restrictions aforesaid on the copying of records for the reason that relator seeks such inspection and copies for improper purposes as hereinafter set forth.

"Respondents state that for a long period of time relator has been at odds with respondents over the management of the said corporation; that he has sought to force respondent Cassell, the majority stockholder, to sell to relator all or a substantial part of his stock in the corporation; that, failing this, he has pursued a course of harassment intended to injure the corporation and has threatened to set up an art studio in competition with the corporation. That he has had meetings at his home with the artists performing work for the corporation from which meetings respondents were excluded and by various and divers means has stirred up unrest among the artists and salaried personnel of the corporation, lowering morale and efficiency and thus injuring the corporation.

"Respondents state that in the normal course of business a number of artists of varying degrees of skill and experience will work on a project, the finished product being delivered by the corporation to its client and the client billed therefor. The distribution of compensation among the participating artists, who, collectively receive a

share of the billing, presents a difficult problem of judgment for management. It is a trade practice not to divulge the manner in which distribution is made in order to avoid controversies, which would inevitably follow such publication. Respondents state that the copying of such material from the books of the company can serve no useful purpose, but that relator intends to distribute such information among the various artists to cause further unrest and injury to the corporation."

The foregoing allegations were denied by relator in his reply.

The evidence shows that early in 1955 relator reached the conclusion that there should be an equalization of stock ownership as between himself and Cassell. Discussions were had on this subject but no agreement was ever reached. At one of the meetings Cassell told relator there were rumors that he was going to set up a studio of his own. Relator assured Cassell there was no truth to the rumors. The next day a telegram addressed to relator was delivered to the studio. Relator was not in at the time. The telegram was opened by one of the employees and shown to Cassell. This telegram was signed "Reno" and read as follows: "Without contract would still consider office as we suggested. All can come. Stock O.K. It's for you to decide." Relator admitted receiving the telegram. It was from Reno Biondi who was in the advertising art business in Chicago. Relator did not give any explanation of this telegram. He did state, however, that he considered going to Chicago to look for a job. He made a trip to Chicago, but testified that it did not involve discussions with Reno Biondi. He told Cassell that he planned to make the trip, and while he was in Chicago Cassell called him on the telephone and asked him if he had concluded any kind of a satisfactory deal. In reply he told Cassel that he was not prepared to discuss the matter. He further stated that Cassell at the time was

under the impression, based on the telegram, that he was dealing with Reno Biondi although he (relator) had spent almost a solid day trying to dissuade Cassell of the idea.

Cassell testified that when he mentioned the telegram to relator the latter replied: "there wasn't anything to it; that it didn't need explaining." Cassell's testimony with reference to the telephone conversation was as follows:

"I had asked him whether he had made up his mind whether he was going to make this deal with Reno, or with Biondi, and he said he hadn't made up his mind. At the same time I had asked him if Reno had offered him as much stock in this new company that was about to be formed—or assumed to be formed—as he had in our outfit or company. He said he couldn't—he hadn't made up his mind and he couldn't answer that at this time.

"Q. Was it your understanding it dealt with a studio in St. Louis? A. Yes, sir."

Roy Paul testified that in January, 1954, relator asked to be relieved from participation in the actual management of the business in order that he might do art work at home. Thereafter, not more than ten or fifteen per cent of relator's work was done at the studio. The morale at the studio during that time was good. There was good cooperation at the studio, and the company enjoyed a good business. Since the first of the year 1955 relator came to the studio more frequently. He spent most of his time at the studio. The witness testified:

"Most of his time, from my own personal observation, was spent talking to groups of artists, either in their individual studios or in the privacy of his studio. Also, we have a third floor, which is separated from the other two floors. We have our Air Force

Department there. He spent a great deal of time talking to the people on that floor. I would say the majority of his time was spent in conversation with the studio personnel."

The witness further testified that there was a decided change in the studio morale since the first of the year 1955. He stated:

"There was an uneasy feeling. I didn't sense it at first, having my own duties to perform, until my studio manager, my art director, and production manager for the Air Force contracts, told me they were worried about the feelings of the people in the studio; that there seemed to be cliques and groups discussing whether the studio was going to stay in existence, or whether it was about to be broken up, and they felt their security was too inadequate, and it made them nervous, and the result showed up in the work that we put out."

The witness stated that the quality of the work put out by the artists was affected very much; that there were mistakes made; that clients returned work which had to be done over, which cost money; and that clients would not pay for work.

Appellant Paul testified that certain records were considered trade secrets. These records were "the accounts that we do business with, how much money they spend with us, what our percentage of profit is from one company over another company; who is a good client, who is a medium client, who is a poor client." He stated that there would be injury if such information got into the hands of a competitor. Paul further testified that several artists may work on a single job, requiring allocations of compensation. That as a result of varying skills and other factors, artists doing similar work may not receive the same compensation. Both Paul and relator testified that disclosure of such information would result in dissension.

Relator had been given the foregoing information since 1949, and had never divulged it. He stated he desired to make copies of that information. He denied any intention of divulging "trade secrets" to artists or competitors.

A week prior to the hearing, relator, along with other stockholders, personally signed a note for the company in the amount of $20,000. When asked what his purpose was in seeking copies of the various books and records, relator replied that he thought it was his responsibility as a director to know the nature of the cash assets, the outlays and income of the company. Also, for the reason that, having signed notes personally for the company for a considerable amount, he would like to know how the money was being spent. He stated that this action was based on his rights as a stockholder and his duties as a director, and that he would like in some instances more detailed information than that contained in the balance sheets and statements of his account which were furnished by the company.

Appellant Paul testified that it was agreeable to him for relator to see the books, but not to make copies thereof. Appellant Cassell gave like testimony.

Appellants' first point is that the writ of mandamus should have been denied for the reason that relator's purpose in seeking an inspection of the books and records was to oppress and harass the appellants, and to use the information obtained to wreck the business of the company.

It is relator's position that he is seeking to enforce a right given him by statute, Section 351.215 RSMo 1949, V.A.M.S.; that this statutory right of inspection is absolute, and therefore his motives are not a proper subject of inquiry in this proceeding.

While there are cases in the books which support the relator's view, we are not persuaded of their correctness. The

**652**

writ of mandamus has always been considered a discretionary writ, and not a writ of right. And while it is true that the statute confers on a stockholder the right of inspection in absolute terms, the court may, in the exercise of its discretion, refuse the aid of its writ of mandamus to enforce such right if it appears that the inspection is sought for some evil, improper, or unlawful purpose. State ex rel. English v. Lazarus, 127 Mo.App. 401, 105 S.W. 780; State ex rel. Haeussler v. German Mutual Life Ins. Co. of St. Louis, 169 Mo.App. 354, 152 S.W. 618; State ex rel. Manlin v. Druggists' Addressing Co., Mo. App., 113 S.W.2d 1061; Guaranty Old Line Life Co. v. McCallum, Tex.Civ.App., 97 S.W.2d 966; Insuranshares Corporation of Delaware v. Kirchner, 1 Terry 105, 40 Del. 105, 5 A.2d 519; Slay v. Polonia Pub. Co., 249 Mich. 609, 229 N.W. 434; Moore v. Rock Creek Oil Corp., Tex.Com.App., 59 S.W.2d 815; State ex rel. Theile v. Cities Service Co., 1 W.W.Harr. 514, 31 Del. 514, 115 A. 773, 22 A.L.R. 8; Guthrie v. Harkness, 199 U.S. 148, 26 S.Ct. 4, 50 L.Ed. 130; Withington v. Bradley, 111 Me. 384, 89 A. 201. We will, therefore, examine the record to ascertain if appellants' contention is sound. If the charges made by appellants are true, then relator should be denied the use of the writ of mandamus to enforce both his statutory and common-law right of inspection.

Appellants say that relator's evil purpose is shown by (1) the breadth of his demand, and his refusal to specify the books and records which he desired to inspect; (2) his summary rejection of the offer of visual inspection in the presence of the officers of the company; (3) his controversy with appellants over the matter of redistribution of stock ownership; (4) his dealings with Reno. Biondi in relation to setting up a rival business; and (5) the stirring up of unrest amongst the artists at the studio.

■ The right of a stockholder to inspect the books and records of the corporation, at common law and under the statute, is based upon his interest in the assets and business of the company. He is entitled to such inspection even though his only object is to ascertain whether the affairs of the company have been properly conducted by the directors and managers. He has a right to know how the affairs of the company are conducted, and whether the capital of which he has contributed a share is being prudently and profitably employed. Such a right is necessary for the stockholder's protection. Huylar v. Cragin Cattle Co., 40 N.J.Eq. 392, 2 A. 274; Otis-Hidden Co. v. Scheirich, 187 Ky. 423, 219 S.W. 191, 22 A.L.R. 19; Hodder v. George Hogg Co., 223 Pa. 196, 72 A. 553; Orlando v. Reliance Homestead Ass'n, 171 La. 1027, 132 So. 777; State ex rel. Weinberg v. Pacific Brewing and Malting Co., 21 Wash. 451, 58 P. 584, 47 L.R.A. 208. As was said by the court in Varney v. Baker, 194 Mass. 239, 80 N.E. 524, 525:

"The stockholders of a corporation are the equitable owners of its assets, and the officers act in a fiduciary relation as agents of the corporation and of the stockholders. They should be ready to account to the stockholders for their doings at all reasonable times, and the stockholders have a right to inspect their records and accounts, and to ascertain whether they are faithful, honest and intelligent in the performance of their duties."

■ This right of inspection extends to all books, records, papers, contracts or other instruments which will enable the stockholder better to protect his interest and perform his duties as a stockholder. Ellsworth v. Dorwart, 95 Iowa 108, 63 N.W. 588; Otis-Hidden Co. v. Scheirich, 187 Ky. 423, 219 S.W. 191, 22 A.L.R. 19; State ex rel. McClure v. Malleable Iron Range Co., 177 Wis. 582, 187 N.W. 646, 22 A.L.R. 5; Weinhenmayer v. Bitner, 88 Md. 325, 42 A. 245, 45 L.R.A. 446. A request to exercise such right is attended by a presumption of good faith and honesty

of purpose. William Coale Development Co. v. Kennedy, 121 Ohio St. 582, 170 N.E. 434; Orlando v. Reliance Homestead Ass'n, 171 La. 1027, 132 So. 777; Stone v. Kellogg, 165 Ill. 192, 46 N.E. 222; Bundy v. Robbins & Myers, Inc., Ohio App., 75 N.E.2d 717.

One who seeks to enforce his common-law right of inspection makes a prima facie showing of proper purpose upon proof of his interest as a stockholder, aided by such presumption of good faith. Where the statutory right is sought to be enforced the burden of overcoming such presumption should be borne by those objecting to the inspection. State ex rel. Spinney v. Sportsman's Park & Club Ass'n, 29 Mo. App. 326; Dreyfus & Sons v. Benson, Tex.Civ.App., 239 S.W. 347; Foster v. White, 86 Ala. 467, 6 So. 88; Cobb v. Lagarde & Sons, 129 Ala. 488, 30 So. 326; Nettles v. McConnell, 151 Ala. 538, 43 So. 838; Clawson v. Clayton, 33 Utah 266, 93 P. 729; Burns v. Drennen, 220 Ala. 404, 125 So. 667; Dines v. Harris, 88 Colo. 22, 291 P. 1024; Ontjes v. Harrer, 208 Iowa 1217, 227 N.W. 101; William Coale Development Co. v. Kennedy, 121 Ohio St. 582, 170 N.E. 434; Rock Creek Oil Corporation v. Moore, Tex.Civ.App., 41 S.W. 2d 501; Hauser v. York Water Co., 278 Pa. 387, 123 A. 330; State ex rel. Weinberg v. Pacific Brewing & Malting Co., 21 Wash. 451, 58 P. 584, 47 L.R.A. 208; Insuranshares Corporation of Delaware v. Kirchner, 1 Terry 105, 40 Del. 105, 5 A.2d 519.

■ Both at common law and under the statutes the right of the stockholder to inspect and examine the books and papers of a corporation carries with it the right to make abstracts, memoranda, or copies thereof. To deny a stockholder such right virtually amounts to a denial of the right to inspect. State ex rel. Johnson v. St. Louis Transit Co., 124 Mo.App. 111, 100 S.W. 1126; Babcock v. Harrsch, 310 Ill. 413, 141 N.E. 701; People ex rel. Lorge v. Consolidated Nat. Bank, 105 App.

Div. 409, 94 N.Y.S. 173; Mutter v. Eastern & Midlands Ry. Co., L.R. (1888), 38 Ch.Div. (Eng.) 92; Drake v. Newton Amusement Corp., 123 N.J.L. 560, 9 A.2d 636; Bundy v. Robbins & Myers, Inc., Ohio App., 75 N.E.2d 717; Powelson v. Tennessee Eastern Electric Co., 220 Mass. 380, 107 N.E. 997; Shea v. Parker, 234 Mass. 592, 126 N.E. 47; Swift v. State ex rel. Richardson, 7 Houst., Del., 856, 6 A. 856, 32 A. 143; Withington v. Bradley, 111 Me. 384, 89 A. 201; State ex rel. Healy v. Superior Oil Corp., 1 Terry 460, 40 Del. 460, 13 A.2d 453; Cincinnati Volksblatt Co. v. Hoffmeister, 62 Ohio St. 189, 56 N.E. 1033, 48 L.R.A. 732; Varney v. Baker, 194 Mass. 239, 80 N.E. 524.

The reason for the rule is set out in People ex rel. Lorge v. Consolidated National Bank, 105 App.Div. 409, 94 N.Y.S. 173, 175, as follows:

"The right of inspection thus given is to inform the shareholder of the facts appearing in the book, so that he may act thereon. He is entitled to all of the information disclosed by the book. It is not to be presumed that he can carry in his memory all of its contents, and, as the inspection is granted for the purpose of informing him concerning the matter, he has the right to make such copies and memoranda as will make the inspection effectual not only by conveying to his mind the contents of the book, but also by enabling him to retain the same in such form that he may act thereon for any legitimate purpose. The right of inspection, therefore, carries with it the right to make such extracts from the book as will enable the shareholder to retain the information disclosed by the inspector."

Since relator's demand did not exceed that to which he was entitled under the law, no unfavorable inference may be drawn from his actions in that respect. If his motives were evil or unlawful the evidence of it must be found elsewhere.

In an attempt to establish such evil motive appellants point to relator's attempt to secure a redistribution of stock, his dealings with Reno Biondi, and the stirring up of unrest amongst the artists in the studio.

Relator's unsuccessful attempt to secure a redistribution of stock ownership may have resulted in ill feeling between the parties, but we are not convinced that it caused relator to enter upon a campaign of harassment and oppression, or that by reason thereof he deliberately set out to wreck the company. There are other facts and circumstances which tend to repel such inferences.

Relator did art work for the company. In addition to being a director, he owned one-fourth of the business. In other words, he made his living off the company. Under the circumstances, it would be unreasonable to believe that he would want to destroy the company and this source of income, absent strong and convincing evidence that such was his purpose. But appellants say that this evidence may be found in his dealings with Biondi; that the evidence clearly shows there was a deal between relator and Biondi to open a competing studio and to raid the corporation's personnel to staff it.

Notwithstanding relator's denial, there must have been some negotiations between relator and Biondi in relation to the establishment of an art studio. However, it does not appear where this studio might be located, or whether it would compete with the corporation for business in its trade area. Any inference that relator and Biondi planned to raid the personnel of the corporation to staff this new business would rest on pure speculation and conjecture. The same may be said with reference to the contention that relator planned to reveal confidential information to competitors and studio artists. There was simply no sufficient evidence of such a scheme to warrant placing restrictions with reference thereto on his right of inspection.

■ But even if relator intended to establish a rival concern, it would not have justified a denial of his right of inspection. Weinhenmayer v. Bitner, 88 Md. 325, 42 A. 245, 45 L.R.A. 446; Schmidt v. Anderson, 29 N.D. 262, 150 N.W. 871; Wyckoff v. Hardware Supply Co., 134 N.J.L. 172, 46 A.2d 669; Bundy v. Robbins & Myers, Inc., Ohio App., 75 N.E.2d 717. The mere fact that a stockholder seeking inspection is on unfriendly terms with the officers and is also a stockholder in a rival or competing corporation is not, apart from improper motives, grounds for denying his right of inspection. Johnson v. Langdon, 135 Cal. 624, 67 P. 1050; Mayer v. Cincinnati Economy Drug Co., 89 Ohio App. 512, 516, 103 N.E.2d 1; Kuhbach v. Irving Cut Glass Co., 220 Pa. 427, 69 A. 981, 20 L.R.A.,N.S., 185; Cobb v. Lagarde & Sons, 129 Ala. 488, 30 So. 326.

■ As a director of the corporation it is essential to the proper performance of his duties as such that relator have access to the corporation's books of accounts and other records. The information therein contained is ordinarily necessary to the exercise of the judgment required of directors in the performance of their official duties. For this reason, the courts have held that the right of a director to examine the books and records is an unqualified right. State ex rel. Dixon v. Missouri-Kansas Pipe Line Co., 3 Terry 423, 42 Del. 423, 36 A.2d 29; Machen v. Machen & Mayer Electrical Mfg. Co., 237 Pa. 212, 85 A. 100, 42 L.R.A.,N.S., 1079; People ex rel. Wilkins v. M. Ascher Silk Corp., 207 App.Div. 168, 201 N.Y.S. 739, affirmed 237 N.Y. 574, 143 N.E. 748.

It is also urged that the writ should be denied because "the offer of the company was more liberal than relator is entitled to as a matter of right, so that there has been in fact no denial of any right to inspect."

The offer referred to was contained in the letter of Mr. Cassell, which we have heretofore set out in this opinion. By its

terms relator would be allowed to examine the books of the company, in the presence of an officer of the company, and would be given balance sheets showing the condition of the company and a monthly statement of his account. He was denied the right to make copies of any portion of the books.

We cannot agree that this offer tendered an inspection which was more liberal than the one relator was entitled to under the law. Under the statute the relator was entitled to inspect the books of the company, and under the common law he was entitled to inspect such papers, contracts, and other documents as were reasonably related to his interest as a stockholder. As a director he has at common law an absolute right of inspection. Under the decisions, he was entitled to make the desired copies. The offer denied him this right and unduly restricted his rights under the common law. Nor can the right of a stockholder or director to inspect the books and records be taken away by the substitution of some other method of informing him of the matters of which he desires to learn. Johnson Ranch Royalty Co. v. Hickey, Tex.Civ.App., 31 S.W.2d 150; Feick v. Hill Bread Co., 91 N.J.L. 486, 103 A. 813.

■ We are of the opinion that bad faith on the part of relator, charged by appellants in their return, is not shown so as to affect the rights of relator to the remedy sought. The trial court properly issued its writ in this case.

■ Appellants' next assignment is that the court erred in entering judgment in the sum of $250 in favor of relator and against appellant Cassell. Said sum was assessed as a penalty under paragraph 2 of Section 351.215 RSMo 1949, V.A.M.S. which provides as follows:

"If any officer of a corporation having charge of the books of the corpora-

tion shall, upon the demand of a shareholder, refuse or neglect to exhibit and submit them to examination, he shall, for each offense, forfeit the sum of two hundred and fifty dollars."

Appellants contend that the statute does not authorize a money judgment in favor of the stockholder, but, rather, creates a forfeiture to be disposed of in accordance with the provisions of Section 7 of Article IX of the Constitution, V.A.M.S. Said section provides that: "* * *. the clear proceeds of all penalties, forfeitures and fines collected hereafter for any breach of the penal laws of the state, * * * shall be distributed annually to the schools of the several counties according to law."

It has been held that the penalties payable to the school fund under the above mentioned constitutional provision refer only to those penalties which accrue to the State, and not to penalties payable to private persons for their own use. Barnett v. Atlantic & P. R. Co., 68 Mo. 56; State ex rel. Rodes v. Warner, 197 Mo. 650, 94 S.W. 962. The question then presented is whether it was the legislative intent that the penalty provided for in Section 351.-215, supra, should accrue to the stockholder or to the State.

The statute in question does not impose a penalty for an offense against the State, but for the violation of a private right. In our judgment, the statute therefore should be construed as affording a right of action for the penalty in favor of the stockholder, as the person intended to be benefited by the statute. 70 C.J.S., Penalties, § 5, p. 394.

We find no error in the record. The judgment is affirmed.

MATTHES, J., and ELMO B. HUNTER, Special Judge, concur.