**UNITED STATES of America, ex rel. Guy DETRICK, Plaintiff**

v.

**DANIEL F. YOUNG, INC., et al., Defendants.**

Civ. A. No. 95–1090–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 18, 1995.

Frank C. Razzano, Johnathan Feld, Lisa E. Perkins, Camhy Karlinsky Stein Razzano & Rubin, Washington, DC, for relator.

Helan F. Fahey, United States Attorney, Gerard J. Mene, Assistant United States Attorney, Alexandria, VA, for U.S.

## MEMORANDUM OPINION

ELLIS, District Judge.

 This *qui tam* action [1] presents novel questions concerning the nature and scope of the "direct and independent knowledge" a person must have to qualify as a relator [2] under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* More specifically, the questions presented are as follows:

(i) Is the question whether a person has the requisite "direct and independent knowledge" of false claims to serve as an FCA relator determined by reference solely to the person's § 3730(b)(2) written disclosure statement to the government? If not, what else may be referred to for the purpose of determining whether a person has this knowledge?

(ii) How much information must a person have and disclose to the government to earn relator status? Put another way, what standard describes the nature and quantum of knowledge concerning false claims that a person must have to qualify as an FCA relator?

(iii) And finally, does the "direct and independent knowledge" of the putative relator in this case meet the FCA standard?

### I.

Guy Detrick ("Detrick") is the putative relator in this case. During the times relevant here, Detrick and his wife owned and operated two companies involved in the shipping business. Northeast Container Corporation ("NCC") provided warehousing services for international freight forwarders, [3] and Fast Forward, Inc. shipped "secret level" freight [4] pursuant to special authorization from the Department of Defense Investigative Services ("DODIS"). One of Detrick's major international freight forwarding clients was Panalpina, Inc. ("Panalpina"). Between 1986 and 1990, NCC provided warehousing services to Panalpina under a long-term contract performed chiefly at the latter's Sterling, Virginia location. This relationship represented ninety percent of NCC's total business.

In 1989, Panalpina contracted with the Turkish government to transport military equipment and hardware to Turkey from various locations in the United States. This contract was part of the Foreign Military

---

**1.** The phrase "qui tam" is taken from the longer Latin expression "qui tam pro domino rege quam pro se ipso in hac parte sequitur," meaning "who brings the action for the king as well as for himself." *See* William Blackstone, *Commentaries on the Law of England* 160 (1768). Thus, a *qui tam* action is one

> brought by an informer under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person bringing such action and the remainder to the statute or some other institution....

*State ex rel. Rodes v. Warner,* 197 Mo. 650, 94 S.W. 962, 965 (1906) (quoting *Black's Law Dictionary* ); *see also Williams v. Wells Fargo & Co.,* 177 F. 352 (8th Cir.1910) (describing *qui tam* actions as one to recover penalty, brought by informer pursuant to statute where one portion of recovery goes to informer and other portion to state); *United States ex rel. Rodriguez v. Weekly Publications,* 74 F.Supp. 763, 765 (S.D.N.Y. 1947); *Erickson v. American Inst. of Bio. Sciences,* 716 F.Supp. 908, 909 n. 1 (E.D.Va.1989).

**2.** A "relator" is simply an informer plaintiff, that is, a person with evidence of fraud on the government who is permitted to institute a damages suit in the government's name against those who perpetrated the fraud. *See Black's Law Dictionary* 1158 (5th ed. 1979); *see also Erickson,* 716 F.Supp. at 909.

**3.** An international freight forwarder specializes in transporting goods from one country to another. As such, an international freight forwarder typically enlists first the services of general shipping companies to transport the goods inland to the point of departure from the United States, and the services of warehousers to store the goods at that point until they are shipped overseas.

**4.** "Secret level" freight, it appears, consists of sensitive, classified material that may only be handled by those with the requisite security clearance from the Department of Defense.

Sales Program ("FMSP"), a financial assistance program under which certain foreign governments receive grants from the United States government to purchase military hardware and equipment manufactured in the United States. The FMSP also includes a provision under which the United States government, in certain instances, reimburses the foreign government for the cost of transporting the military goods within the United States and from the United States to the foreign country.

NCC's relationship with Panalpina began to deteriorate soon after Panalpina won the Turkey FMSP contract. Ultimately, in April 1990, Detrick felt compelled to abandon the NCC–Panalpina contract when Panalpina unilaterally reduced the rates it paid NCC. When this occurred, Sylvan Friedman ("Friedman") stepped into the void left by NCC's departure. With two of his companies, Multi–Modal Freight Systems, Inc. ("MMFS–MD") and Multi–Modal Freight Systems of Virginia ("MMFS–VA"), Friedman began to perform the warehousing services for Panalpina's Sterling facility.

Notwithstanding his abandonment of the NCC contract, Detrick continued working for Panalpina in a different capacity until sometime in 1992 because Fast Forward, Inc., his other company, had the DODIS security clearance required for handling Panalpina's "secret level" freight forwarding. In mid–1991, while performing these services, Detrick was approached by a former NCC employee who was then employed by Friedman. The employee presented Detrick with a shipping invoice that showed a discrepancy in transportation charges purportedly incurred by Panalpina and MMFS–MD in connection with the Turkey FMSP account. This invoice led Detrick to suspect the existence of a fraudulent scheme to overbill the account. Acting on this suspicion, he undertook an independent investigation of documents located in Panalpina's office. Detrick's sleuthing uncovered invoices, internal memoranda, and financial documents that confirmed his suspicions of fraudulent activity by Friedman

and Panalpina with respect to the Turkey FMSP account. Pieced together, the documents laid bare the outlines of a fraudulent scheme involving Panalpina and Friedman. More particularly, the documents disclosed that Friedman and Panalpina routinely added false charges to legitimate freight bills from legitimate inland motor carriers and then submitted the doctored figures to the Turkish government for payment after reprinting them on invoices from one of a number of shell freight forwarding companies maintained by Friedman (the "Friedman dba's").[5] In addition, when either MMFS–MD or MMFS–VA actually transported equipment, Friedman and Panalpina submitted inflated invoices reflecting rates that were up to three hundred percent of the genuine shipping cost. From these documents, Detrick concluded that Friedman and Panalpina were engaged in a fraudulent scheme to charge the United States government, through the Turkish government, for false and inflated shipping expenses.

Detrick wasted no time in sharing his documented information with the government. Thus, on June 14, 1991, Detrick disclosed to the Internal Revenue Service ("IRS") all that he had discovered about Friedman and Panalpina's fraudulent rebilling scheme. He also disclosed this information to the Office of the Inspector General at the Department of State and to the United States Attorney for the Eastern District of Virginia. Also during the summer of 1991, Detrick met with an Assistant United States Attorney and agents of the Federal Bureau of Investigations ("FBI"), the Federal Maritime Commission, and the Department of Defense, and provided these persons and agencies with the information and copies of the documentary evidence he had gathered concerning Friedman's activities with Panalpina. These disclosures triggered a government investigation.

That same summer of 1991, while he was crating equipment as an independent contractor for Daniel F. Young, Inc. ("D.F. Young"), a competitor of Panalpina, Detrick

---

5. Friedman had established several shell companies, referred to as "dba's" (i.e., "doing business as"). For the most part, these companies had no employees, no offices, no telephones, and conducted no business. Their principal function was to facilitate the fraudulent rebilling scheme.

began to suspect that Friedman and D.F. Young were colluding to perpetrate the same type of fraudulent scheme as that engaged in by Friedman and Panalpina. This suspicion was based on his earlier investigation of Friedman and Panalpina, which had led him to believe that Friedman was engaged in a similar scheme with another international freight forwarder.[6] His suspicion that D.F. Young might be this other international freight forwarder was fueled by a number of observations he made while working at D.F. Young. First, Detrick discovered that Friedman performed warehousing services for D.F. Young in conjunction with that company's shipment of military equipment to Egypt under the FMSP. Second, he witnessed Friedman's son deliver an envelope to two D.F. Young employees, William Hines and John Gillespie, at the company's administrative offices. Furthermore, Hines and Gillespie rebuffed his request to bid on additional work with D.F. Young by saying that the company's relationship with Friedman was "excellent." All of this, Detrick claims, he disclosed to the government agents during the summer of 1991, though he concedes that the great bulk of the information he relayed to the government during this period and later pertained to the details of the Friedman/Panalpina scheme. This was so because the evidence Detrick had concerning the Friedman/Panalpina scheme was detailed, voluminous, and documented, whereas his information relating to D.F. Young and Friedman was speculative, sparse, and undocumented.

For the remainder of 1991, Detrick continued to cooperate with the government with respect to his knowledge of Friedman and Panalpina's fraudulent rebilling activity. Thus, Detrick testified on this subject before the grand jury for the Eastern District of Virginia in December 1991. Between the date of his grand jury testimony and August 1992, when the FBI raided Panalpina's offices, Detrick continued to render assistance in the ongoing criminal investigation. This assistance, together with his prior disclosures, apparently formed the factual basis for the affidavit on which the government relied to obtain the search warrant for Panalpina's business records.

As a result of the government's investigation, Sylvan Friedman was ultimately charged in a criminal information with various offenses, including money laundering and conspiracy to impair and impede the functioning of the IRS through fraudulent billing practices. In May 1994, Friedman pled guilty to this criminal information.[7]

It was not until March 9, 1995, that Detrick filed this *qui tam* action under the FCA, 31 U.S.C. §§ 3729–33 (Supp.1995). The complaint named as defendants Sylvan Friedman, twenty Friedman companies or dba's, Panalpina, Inc., and John Does I through X. Pursuant to 31 U.S.C. § 3730(b)(2), Detrick also filed a disclosure statement and a copy of the complaint with the United States. The initial disclosure statement described the fraudulent activity as involving Friedman and "international freight forwarders which were transporting military hardware and equipment to various countries pursuant to the FMSP." Also expressed in the initial disclosure statement was Detrick's belief that "prior to the award of the Turkey FMSP contract to Panalpina, Friedman and MMFS–MD provided warehousing and other services to D.F. Young and/or Herman Ludwig (referred to as Doe I and/or Doe II in the qui tam complaint) in connection with the Turkey FMSP account." This reference was the only identification of the John Does to appear in either Detrick's complaint or his written disclosure to the government. Further, the written disclosure

---

6. For instance, Detrick had discovered that Friedman had incorporated some of his dba's significantly before the start of the rebilling activity with Panalpina. This suggested to him that Friedman's fraudulent activities predated his relationship with Panalpina. He also knew that Friedman had worked either with D.F. Young or with another company, Herman Ludwig, in conjunction with the Turkey FMSP account before that account was transferred to Panalpina.

7. On July 15, 1994, Friedman was sentenced to a 70–month period of incarceration for these offenses and ordered to pay $1,000,000 in restitution. On July 7, 1995, pursuant to a Rule 35, Fed.R.Crim.P. motion brought by the government, Friedman's sentence was reduced to 24 months.

also stated that Detrick had "suspected and the United States' subsequent investigation confirmed that Friedman had originally developed and engaged in this rebilling scheme in connection with FMSP contracts with respect to at least Turkey and Egypt, while acting as a property broker to Panalpina's competitors, D.F. Young and/or Herman Ludwig." And finally, in describing the details of the Panalpina/Friedman fraud, Detrick called it "the same routine which had applied in the case of D.F. Young and/or Herman Ludwig with respect to the Turkey and Egypt FMSP contracts."

On April 11, 1995, the United States filed a request under 31 U.S.C. § 3730(b)(3) for a one-year extension of time to decide whether to intervene in the FCA action, on the alternative bases that a criminal investigation was pending and that the complaint named Doe defendants. The government explained in its request that it had waived any civil claims against Friedman or his companies as part of the latter's 1994 guilty plea. The government also reported that because the activity engaged in by Panalpina did not involve payment of money from the U.S. Treasury, Panalpina was not a proper subject of the FCA action. From these representations, it was apparent that the John Does were the only defendants against whom Detrick's action retained vitality.

That same day, April 11, 1995, a federal grand jury in the Eastern District of Virginia indicted William Hines and John Gillespie for crimes involving false and fraudulent rebilling activity in connection with D.F. Young's role in the Turkey FMSP contract.[8] At a May 5 hearing on the government's request for an extension of time, the Court, without ruling on the question, expressed doubt whether a *qui tam* action could proceed against John Doe defendants alone.[9] Concerned perhaps that his complaint was vul-

nerable on this ground, Detrick, with leave of Court, then filed an amended complaint on May 19, 1995. This amended complaint listed only Hines, Gillespie, and D.F. Young as defendants,[10] and its allegations mirrored substantial portions of the recent Hines/Gillespie indictment. Detrick also submitted an amended disclosure statement and a second amended disclosure statement to the United States, again mirroring to a great extent the April 11 indictment.

The Court entered two Orders on June 8, 1995, (i) denying the government's request for a twelve-month extension, but granting instead an extension only until August 7, 1995,[11] and (ii) granting the government leave to file a suggestion of dismissal by June 15, with a response due from Detrick by June 23. After a hearing on these submissions on August 4, 1995, the Court requested additional briefing and an affidavit from Detrick detailing his direct and independent knowledge of any fraudulent activity by the three currently named defendants.

## II.

The FCA ferrets out fraud on the government by offering an incentive to persons with evidence of such fraud to come forward and disclose that evidence to the government. *See* 31 U.S.C. § 3729 *et seq.* The mechanism for coming forward and disclosing evidence of fraud is the *qui tam* action. This is an action filed by a relator, as the *qui tam* plaintiff is called, in the name of the United States against any defendants alleged to have defrauded the government. The incentive for filing such a suit is economic, namely, a share in any fraud damages ultimately recovered.[12]

Upon filing a *qui tam* suit, one of the relator's first duties is to send a copy of the complaint and a written disclosure statement

---

**8.** Hines and Gillespie were found guilty after a jury trial in July 1995 and were sentenced to 40 months imprisonment.

**9.** These doubts were based on the reasoning that appears *infra* part II.B.

**10.** Detrick evidently recognized that, because the government had settled its civil claims with Friedman and because Turkey was not reim-

bursed by the United States, the John Does were the only remaining defendants against whom he might pursue an FCA claim.

**11.** On August 4, 1995, the government's deadline for deciding whether to take over the action was extended until further Order of the Court.

**12.** 31 U.S.C. § 3730(d).

"of substantially all material evidence and information the person possesses" to the government, which then has sixty days to decide whether to intervene and take over the suit.[13] This decision affects both the amount of the relator's recovery and the extent of his participation in the suit. If the government decides to intervene and prosecute the suit, the relator relinquishes control of the action to the government and thereafter plays a decidedly secondary role in the litigation.[14] In this event, the relator's recovery is limited to a range of fifteen to twenty-five percent of any eventual award against the defendant.[15] If the government chooses not to intervene, the relator may proceed to prosecute the action,[16] and if the relator is successful, his potential recovery increases to between twenty-five and thirty percent of any award against the defendant.[17]

■ These economic benefits are not easily gained; certain statutory requirements must be met before a plaintiff can gain relator status.[18] Chief among these is that where, as here, a *qui tam* action is "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing," [19] courts have no jurisdiction to hear the matter unless the plaintiff relator is an "original source." 31 U.S.C. § 3730(e)(4)(A). And, an "original source" is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing [the action]." 31 U.S.C. § 3730(e)(4)(B). A putative relator's knowledge is "direct" if he acquired it through his own efforts, without an intervening agency, and it is "independent" if the knowledge is not dependent on public disclosure. *See United States ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 656 (D.C.Cir.1994).

■ These principles are necessary but not alone sufficient to dispose of this matter. Detrick, to be sure, has some direct and independent knowledge relating to the activities of Hines, Gillespie, and D.F. Young.[20] But the central question is whether his direct and independent knowledge is of the requisite nature and quantity to enable him to qualify as an "original source." A threshold, subsidiary question concerns the sources to which a court may refer in assessing a putative relator's direct and independent knowledge. Each of these matters, together with its application to the instant case, is separately addressed.

## A.

■ The government contends that only the statutorily required written disclosure may be considered in determining whether a putative relator is an "original source." De-

---

13. 31 U.S.C. § 3730(b)(2). This 60–day period may be extended if the government shows good cause. 31 U.S.C. § 3730(b)(3).

14. *See* 31 U.S.C. § 3730(c)(1), (2) (describing rights of relator remaining in suit prosecuted by government).

15. 31 U.S.C. § 3730(d)(1).

16. 31 U.S.C. § 3730(c)(3) (describing relator as sole prosecutor if government declines intervention).

17. 31 U.S.C. § 3730(d)(2).

18. For example, the putative relator must meet certain procedural requirements, such as making written disclosure to the government and filing the complaint in camera and under seal. 31 U.S.C. § 3730(b)(2).

19. A comparison of the publicly disclosed Hines–Gillespie indictment with Detrick's amended complaint leaves little doubt that the allegations in the latter are "based upon" or derived from those in the former. *See United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1347–49 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994). Indeed, Detrick admits that much of his amended complaint is derived from the indictment. He notes that he did not have a sufficient basis under Rule 11, Fed.R.Civ.P. to name the three current defendants in the amended complaint until the grand jury indictment issued.

20. For example, (i) he discovered that Friedman and D.F. Young were working together in conjunction with the latter's shipment of military equipment to Egypt under the FMSP; (ii) he witnessed Friedman's son deliver an envelope to Hines and Gillespie at D.F. Young's offices; and (iii) his earlier investigation of Friedman and Panalpina had led him to believe that Friedman was engaged in a similar scheme with another freight forwarder in addition to Panalpina.

trick disagrees, contending instead that all information given to the government, whether in written or oral form, is relevant to the "original source" inquiry.[21] Detrick's contention is more plausible, given the language and structure of the statute.

To begin with, nowhere in the statute is there any indication that the "original source" assessment is limited to the written disclosure. Instead, the statute's two disclosure provisions convincingly point away from such a limitation. While the first provision requires a relator to provide the government with a written disclosure statement,[22] that requirement is simply one of several procedural steps integral to the filing of the *qui tam* suit. *See* 31 U.S.C. § 3730(b)(1), (2). More significantly, the second disclosure provision,[23] which contains no requirement that the disclosure be in writing, appears in the section of the statute concerning the jurisdictional requirement that a relator be an "original source" if his fraud allegations are based on public information. *See* 31 U.S.C. § 3730(e)(4)(B). Surely, the provision in the jurisdictional section should control in the jurisdictional inquiry. Thus, a putative relator striving to show he is an "original source" of the allegations in his complaint is not limited to what is contained in the written disclosure; he may also point to all of the information he has given the government, in writing or otherwise.

Sound practical reasons also support this conclusion. The typical relator will be a citizen, like Detrick, who is unsophisticated in the legal intricacies of fraud law, and who happens across evidence of fraud during the course of employment. Some relators may file *qui tam* actions *pro se*. These relators may not know what information or what level of detail must be included in a complaint or in the written disclosure statement to the

government. Given its aim of encouraging ordinary citizens to come forward with knowledge of fraud, it is important that the FCA be liberally construed to allow for unsophisticated relators and for the fact that such relators typically engage in an iterative, cooperative process of disclosure between the government and the relator. Just such a process occurred here. Detrick met with various government agents numerous times over the course of several months to impart his knowledge of fraud to them. It would be patently unjust in circumstances like these to ignore the often substantial amount of significant information a complainant may have communicated to the government orally or in writing prior to the filing of the *qui tam* action by limiting the assessment of relator status to the information submitted in a single written statement. Certainly nothing in the statute requires this. To the contrary, the FCA's language and purpose point persuasively, if not explicitly, to a more sensible and fair principle: the assessment of relator status should take into account all of the information the putative relator has communicated to the government prior to the filing of the action. Only in so doing can there be an accurate and fair assessment of whether the putative relator has played the kind of instrumental role in ferreting out and remedying fraud contemplated by the FCA. Hence, the sum total of direct and independent knowledge Detrick imparted to the various government agents with whom he discussed the rebilling scheme should be considered in evaluating whether he is an "original source" of the allegations.

### B.

The next and more difficult question is the nature and quantum of knowledge of

---

**21.** No one claims that a court should consider information a putative relator says he knew but never communicated to the government. The statute contemplates, indeed requires, that all relevant information be disclosed to the United States. *See* 31 U.S.C. § 3730(b)(2).

**22.** A person may bring a civil action for a violation of section 3729 for the person and for the United States Government.... A copy of the complaint and *written disclosure* of substantially all material evidence and information the

person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure.
31 U.S.C. § 3730(b)(1), (2) (emphasis supplied).

**23.** This provision simply states that the plaintiff relator must have "voluntarily provided the information to the Government before filing an action under this section which is based on the information." *See* 31 U.S.C. § 3730(e)(4)(B).

fraud a putative relator must disclose to win relator status. There is no explicit statutory answer to this question.[24] In the D.C. Circuit's words, "Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the qui tam relator for suits to proceed." *Quinn*, 14 F.3d at 649. Clues to answering the question must therefore be sought in the statute's structure and purpose. *See Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) (holding that meaning of statute is to be determined from design of statute as whole and its object and policy, in addition to its language).

The principal clue is in the FCA's structure. Significantly, the question of the nature and quantum of a relator's knowledge of the fraud arises explicitly only in the context of an "original source" inquiry. In other words, absent a jurisdictional question aris-

ing from the operation of § 3730(e)(4), the sufficiency of a putative relator's knowledge is judged by his complaint, which in turn is judged by the same standards that would govern any other complaint, namely, the pleading requirements of the Federal Rules of Civil Procedure. More specifically, a person filing a *qui tam* complaint, like any other civil complaint, must have an adequate basis under Rule 11, Fed.R.Civ.P. for his fraud allegations,[25] and he must plead those allegations with the particularity required by Rule 9(b), Fed.R.Civ.P.[26] Thus, if a putative relator files a *qui tam* suit without relying on any public disclosure, the "original source" jurisdictional provision is not triggered. In this event, the suit will proceed beyond the threshold stage only if the allegations of fraud have been pled with the specificity required by Rule 9 and have a basis in fact sufficient to satisfy the strictures of Rule 11.[27] In other words, where a putative rela-

**24.** Nor does the existing case law under the FCA provide a satisfactory answer. *United States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407 (9th Cir.1993) appears to be the only decision analyzing the "original source" provision in terms of the quantum of information required to earn relator status. *See infra.* Other decisions interpreting § 3730(e)(4) pertain to (i) whether the putative relator's complaint was "based upon . . . public disclosure," 31 U.S.C. § 3730(e)(4)(A), or (ii) whether a putative relator must be the actual whistleblower to qualify as an "original source." *See* Note, "The False Claims Act—Finding Middle Ground Between Opportunity and Opportunism: The "Original Source" Provision of 31 U.S.C. § 3730(e)(4)," 17 *W.New Eng.L.Rev.* 255 (1995) at 264–66 (collecting cases on meaning of § 3730(e)(4)(A)), and at 256–257 (collecting cases on whether "original source" must be whistleblower).

**25.** Rule 11, which, of course, applies to all civil filings, including *qui tam* complaints, provides in pertinent part as follows:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> \* \* \* \* \* \*
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. . . .

Rule 11, Fed.R.Civ.P. If, after a reasonable pre-complaint inquiry, a person still bases the factual

allegations of his complaint only on rumor or suspicion, he does not have an adequate Rule 11 basis to make those allegations. *See, e.g., Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992).

**26.** Rule 9(b), Fed.R.Civ.P. requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake . . . be stated with particularity." The applicability of Rule 9(b) to *qui tam* actions is well established. *See, e.g., United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 144 (N.D.Ill.1993); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F.Supp. 1055, 1058 (S.D.Ga.1990); *Juliano v. Federal Asset Disposition Association (FADA)*, 736 F.Supp. 348, 353 (D.D.C.1990), *aff'd* 959 F.2d 1101 (D.C.Cir.1992); *see also Cooper v. Blue Cross & Blue Shield of Florida*, 19 F.3d 562, 568 (11th Cir.1994) (applying 9(b) to FCA fraud allegations); *United States ex rel. McCoy v. California Medical Review, Inc.*, 723 F.Supp. 1363, 1372 (N.D.Cal.1989).

**27.** Because a *qui tam* complaint, whether or not it met the requirements of Rules 9 and 11, would presumably state a claim for fraud, Rule 12(b)(6), Fed.R.Civ.P. would not be a threshold barrier. Whether any other Rule 12(b) defenses might apply is irrelevant to the "original source" analysis because those other defenses do not bear on the nature or quantum of information necessary to state a claim of fraud. Thus, a well-pleaded and well-founded complaint filed by a knowledgeable and qualified relator might still falter at the threshold stage because of improper venue, improper or insufficient service of process, or lack of personal jurisdiction.

tor files a *qui tam* action without reliance on any public disclosure, Rules 9 and 11 supply the standards by which to assess the viability of the fraud allegations.

No reason in logic or principle suggests that different standards should come into play in the event a prior disclosure triggers the operation of the jurisdictional "original source" provisions of § 3730(e)(4). If, in the absence of any publicly disclosed information, a person can achieve relator status because the fraud allegations in his complaint pass muster under Rules 9 and 11, then so, too, should a person achieve relator status where, in the face of public disclosures, the person's direct and independent knowledge of the fraud meets the requirements of Rules 9 and 11. A person seeking relator status as an "original source" should not be required to meet standards, in terms of the nature and quantum of information about the fraud, that are different from those that must be met by the person seeking relator status in the absence of any public disclosure. Put another way, the nature and quantum of fraud evidence that a putative relator must possess should be the same whether or not the person's relator status is assessed under § 3730(e)(4). And the measure of that nature and quantum of information is found in the standards of Rules 9 and 11, Fed. R.Civ.P.

 To recapitulate, the FCA contemplates two paradigm paths to relator status. The first is the path a putative relator travels alone, essentially carrying the litigation ball entirely by himself without any government aid or information. This path reflects that the FCA contemplates that a complainant seeking relator status may file a *qui tam* suit alleging fraud in circumstances where there has been no public disclosure of the fraud or information concerning the fraud and where the complainant has had no prior contact with the government concerning the fraud. In this event, provided the fraud allegations meet the standards of Rules 9 and 11, the *qui tam* action will proceed to the discovery stage, and possibly beyond.[28] In other words, a complainant's eligibility for relator status, in terms of fraud knowledge, is measured only by the standards of Rules 9 and 11. And this eligibility, once established, is not affected by subsequent additions to the complainant's knowledge of the fraud. Thus, once the *qui tam* complaint passes the threshold standards of Rules 9 and 11, the complainant's status as relator is established and, as relator, he may thereafter use in the litigation any information derived from discovery, government disclosures, or other sources, without jeopardizing his relator status. By following this FCA paradigm path, then, a complainant's relator status in terms of fraud knowledge is effectively, though not explicitly, determined at the threshold stage by reference to the standards of Rules 9 and 11.

The second paradigm path a complainant may follow on the road to relator status under the FCA arises where the complainant's fraud allegations are derived from, or based in part or in whole on, public disclosures. This situation triggers the FCA's "original source" provision, which requires, as a jurisdictional condition, that the complainant have knowledge of the fraud that is direct and independent of any public disclosures. *See* 31 U.S.C. § 3730(e)(4). As is true of the first paradigm path, the FCA does not explicitly define in these circumstances what quantum of fraud evidence would constitute adequate direct and independent knowledge of fraud. Yet, this does not mean that there is no guidance whatever to be derived from the FCA on this issue. Indeed, as explicated above, an examination of the first paradigm path to relator status leads to the conclusion that the quantum and

---

**28.** *See supra* note 25. After the threshold stage, this paradigm path may split into various subordinate paths. Along one of these subordinate paths, the complainant, as relator, may continue to carry the litigation ball alone until the end of the case, at which time he would be entitled to a 25% to 30% share of any damages recovered. Yet another of the various paths that might develop after the threshold stage is the one along which the government elects to assume responsibility for the case, in which event the relator would play a subsidiary role in the litigation and stand to gain less from any recovery. But, in either event, the complainant's status as relator would already be effectively established at the same stage and by the same standards as would occur in the event the government chose not to assume control of the case.

nature of fraud knowledge necessary to earn relator status for a plaintiff who follows that path are effectively defined by the standards of Rules 9 and 11. Fairness, consistency, and sound policy considerations compel the conclusion that the same standard should obtain in the event the complainant travels to relator status via the second paradigm path, or indeed by any intermediate path.

This conclusion finds support in the FCA's historical development, which reflects that Congress, over time, has rejected both the notion that relator status can be achieved by persons who have no real knowledge of the fraud apart from that already publicly disclosed, and the opposite notion that relator status is foreclosed unless the complainant has independent knowledge of everything in his fraud complaint.[29] The current version of the FCA rejects these polar positions in favor of a middle ground. This middle ground

takes the form of a requirement that a person seeking relator status have a core of knowledge about the fraud, which core the statute implicitly requires but does not explicitly define.

Congress's purpose in enacting the FCA, as that purpose is illuminated by the statute's history, further supports the use of the Rule 9 and Rule 11 standards to measure whether a complainant's direct and independent knowledge of the fraud is enough to merit relator status. This purpose was to encourage individual citizens to act as "private attorneys general" in assisting the government in the discovery and prosecution of fraudulent activity.[30] Yet, this statutory purpose is not fulfilled if a relator is allowed to base all of the information in his complaint on information derived from public sources. In that situation, the putative relator is not

**29.** Thus, when it was first enacted in 1863, the FCA contained no jurisdictional bar comparable to § 3730(e)(4)(A). *See* Act of March 2, 1863, c. 67 12 Stat. 696; *see also United States ex rel. LaValley v. First Nat'l Bank of Boston*, 707 F.Supp. 1351, 1354 (D.Mass.1988). As government and the number of government contracts grew in the 1930s, an increasing number of *qui tam* actions were filed by citizens who based their complaints entirely on information gleaned from public sources and who knew nothing about the fraud before acquiring publicly available information. After the Supreme Court put its imprimatur on such parasitic lawsuits, *see United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), public outcry prompted Congress to overturn *Hess* by enacting amendments to the FCA. *See Quinn*, 14 F.3d at 650. Under these amendments, a relator could not bring a suit "based on evidence or information the Government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded).

This amendment, it seems, went too far, in effect closing the *qui tam* door on putative relators from whom the government had learned about fraud just because these persons gave their knowledge to the government before filing suit under the FCA. Public perception of this new obstacle depressed the use of *qui tam* suits to enforce the FCA, *see Quinn*, 14 F.3d at 650, and the Seventh Circuit transformed the perception into judicial reality with its 1984 decision in *United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir.1984). Congress responded once again by nullifying this judicial interpretation of § 3730. In 1986, it enacted the current version of the *qui tam* statute, which includes the "original source" provision that expressly allows the private prosecution of suits formerly precluded

by *Dean* and the language of the 1943 amendment. *See* 31 U.S.C. § 3730(e)(4)(A) (Supp. 1995). The legislative history of the 1986 amendments demonstrates Congress's clear intent to overrule *Dean* and to make it easier for private citizens to enforce the FCA. *See, e.g.,* S.Rep. No. 345, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 5266.

It follows from this amendment that a putative relator need not have direct and independent knowledge of everything in the complaint to qualify as a relator. Indeed, to apply such a stringent interpretation of the public disclosure restriction would be to return in effect to the pre–1986 version of the statute, in which the "original source" exception did not appear. Courts recognize that giving this exception meaning requires accepting that a relator need not have direct and independent knowledge of all the information on which he wishes to rely in bringing a *qui tam* action. *See, e.g., Quinn*, 14 F.3d at 656–57; *United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential*, 944 F.2d 1149, 1160 (3d Cir.1991).

Subsequent efforts by some members of Congress to alter or amend the jurisdictional bar of § 3730(e)(4) have focused on judicial interpretations of that provision having nothing to do with the nature and quantum of information possessed by the putative relator. *See, e.g.,* H.R.Rep. No. 837, 102d Cong., 2d Sess. 12 (1992) (stating that "clarifications ... are necessary in light of a number of incorrect interpretations" of § 3730(e)(4)); *see also supra* note 24.

**30.** *See* H.R.Rep. No. 660, 99th Cong., 2d Sess. 22 (1986), *cited in United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990).

sounding the alarm, but echoing it, and he does nothing to further the government's efforts to ferret out fraud.[31] His suit may properly be said to be merely parasitic. It was to preclude such parasitic suits that the statutory "original source" requirement was enacted. This jurisdictional bar ensures that the countervailing policies underlying the *qui tam* statute are properly balanced and given effect: the incentives for potential relators to file FCA claims and to give information to the government must be balanced against the need to foreclose parasitic lawsuits. *Quinn*, 14 F.3d at 651. These countervailing policies, in turn, support the use of Rule 9 and Rule 11 as appropriate standards for judging the sufficiency of a putative relator's direct and independent knowledge, as this standard gives effect to both policies simultaneously. On the other hand, the Rules ensure that a complainant cannot qualify as a relator if his complaint is derived completely from public information; the complainant must contribute something to the suit if he is to benefit from it financially. On the other hand, the Rules do not require the complainant to have direct and independent knowledge of everything in his complaint in order to qualify as a relator. In sum, judging eligibility for relator status by reference to Rules 9 and 11 is fully consistent with the FCA's purpose and history. These standards strike the proper balance between opening the *qui tam* door too wide and shutting it altogether.[32]

If the minimum standard for obtaining relator status were set too low, courts would have to accept jurisdiction over *qui tam* suits brought by complainants who had provided only a soupcon of information to the govern-ment, as long as that soupcon somehow led the government down an investigative trail resulting in public disclosure of fraud. Yet, this appears to be the standard in the Ninth Circuit under the rule announced in *United States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407 (9th Cir.1993), the principal authority on which Detrick relies. There, the relator survived a jurisdictional challenge to a complaint he filed against his former employer, a subcontractor producing flight data transmitters for Air Force nuclear cruise missiles. *Northrop*, 5 F.3d at 408. His *qui tam* complaint originally alleged improper inspection procedures and falsification of test results by the company, and he had shared his knowledge of that fraud with the government before the action was filed. He then attempted to amend his complaint to include allegations that Northrop had used inadequate damping fluid. But significantly, this amendment came after a criminal indictment published the damping fluid allegation as well as the allegations the relator had earlier communicated to the government and detailed in his *qui tam* complaint. *Id.* at 408–09. On these facts, the Ninth Circuit upheld the complainant's claim to relator status, holding that a relator is an "original source" with regard to an amendment based upon public information "if he played some part, whether direct or indirect, in the public disclosure of the allegations that are the subject of the proposed amendments." *Id.* at 411.[33] While the result of that case might well fit within the rationale of this case,[34] the opinion may be read to announce a standard that opens the *qui tam* door too wide. By that standard, a complainant might well win rela-

---

**31.** *See United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 39 F.3d 957, 962 (9th Cir.1994).

**32.** Besides being faithful to the letter and spirit of the FCA, the Rule 9 and Rule 11 standards have the added advantages of familiarity, accessibility, and ease of application. Over the years, courts have elucidated and refined these standards in numerous published decisions. *See, e.g.*, 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297 (collecting cases under Rule 9(b)); 5A *id.* § 1335 (collecting cases under Rule 11). The familiarity of the standards should also prove helpful to the putative relator searching for guidance as to whether he has a valid *qui tam* cause of action.

**33.** *Northrop* also held that disclosure resulting from a criminal investigation based on information provided by a relator is not "publicly disclosed" within the meaning of § 3730(e)(4)(A). Because this holding collapses the public disclosure inquiry into the "original source" inquiry, and because it derogates from the plain language of the statute with no apparent justification, this Court submits that it should be accorded little weight.

**34.** Indeed, it seems that the *Northrop* relator's complaint, considered as a whole, might well have satisfied the Rule 9 and Rule 11 standards enunciated here.

tor status merely by communicating to the government, "I think something fishy is going on in connection with Government Contract A and Contractor B," and then relying on the evidence of fraud, if any, disclosed by a subsequent government investigation. Jurisdiction under § 3730 simply cannot be founded on so slender a reed. Indeed, such a standard invites the very type of parasitic, opportunistic lawsuit Congress sought to preclude when it first enacted a jurisdictional bar based on publicly disclosed information.

### III.

■ If, as concluded here, eligibility for FCA relator status is measured by the standards of Rules 9 and 11, it is plain that Detrick falls short. His direct and independent knowledge of the fraudulent activity involving D.F. Young, Hines, and Gillespie satisfies neither Rule 9 nor Rule 11. He did not know, as Rule 9(b) requires, the "who, what, when, where, and how" of the fraud. *See, e.g., Borow v. nVIEW Corp.,* 829 F.Supp. 828, 831 (E.D.Va.1993) (citing *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)).[35] Nor did his precomplaint inquiry yield anything beyond a suspicion or hunch that D.F. Young, Hines, and Gillespie were engaging in fraud with regard to the Egyptian contract. Under Rule 11, this is not enough, for that rule imposes a duty of reasonable precomplaint inquiry that is not satisfied by a suspicion or hunch. *See Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992).[36] Indeed, as Detrick concedes, not until the publication of the indictment of Hines and Gillespie did Detrick have the fraud knowledge sufficient to support a complaint.

■ Thus, Detrick was, in essence, a complainant who went to the government and said, "I think there's something fishy going on in connection with Government Contract A and Contractor B." This is not enough to file a fraud complaint, and it is not enough to earn *qui tam* relator status. And the fact that he provided the government with hard evidence of "something fishy" between Panalpina and Friedman with respect to the Turkey FMSP contract neither alters nor makes up for the fact that he admittedly could not, on his own, have brought a complaint against D.F. Young, Hines, and Gillespie alleging fraud on the government in connection with the Egypt FMSP contract. Allowing him to serve as a relator in the action against D.F. Young, Hines, and Gillespie would be tantamount to encouraging citizens to initiate parasitic lawsuits feeding entirely off government information, or to run to the government with only a suspicion of fraud in the hope that they might later be able to win relator status by riding piggyback on information subsequently developed by a government investigation. Although the *qui tam* provisions of § 3730 are designed to encourage citizens with actual knowledge of fraud to come forward, they are plainly not designed to result in government agencies pursuing fishing expeditions at the behest of suspicious citizens. Moreover, the FCA is not designed to have the government function as a sort of free private investigator to help persons achieve *qui tam* relator status and the resulting opportunity of financial gain.

The result in this case may seem somewhat harsh given the nature and amount of information Detrick provided to the government on Friedman and Panalpina's activities with respect to the Turkey contract, which assistance netted Detrick nothing. And there is no doubt that his suspicions of D.F. Young, *et al.,* although initially only hunches, turned out to be well founded. But his coop-

---

**35.** *See also Hoover v. Langston Equipment Associates, Inc.,* 958 F.2d 742 (6th Cir.1992) (finding pleading inadequate under Rule 9(b) because it failed to specify who made misrepresentations and when fraudulent conduct occurred); *A.I. Credit Corp. v. Hartford Computer Group, Inc.,* 847 F.Supp. 588 (N.D.Ill.1994) (holding fraud not pled with particularity because no specification of when or where fraud occurred or content of allegedly fraudulent statements).

**36.** *See also Gallagher v. Kopera,* 789 F.Supp. 277 (N.D.Ill.1992) (finding allegations in complaint based on rumors and hunches clearly improper under Rule 11); *Gutierrez v. City of Hialeah,* 729 F.Supp. 1329 (S.D.Fla.1990) (stating that Rule 11 duty to make reasonable inquiry into facts underlying suit precludes reliance on speculation, suspicion, rumor, or surmise).

eration with the government must nonetheless be evaluated in light of what he *knew* about D.F. Young, not what he suspected. Viewed in this light, to permit Detrick to qualify as a relator in this case would be to open wide the *qui tam* door to complainants whose efforts to ferret out fraud on the government fall far short of the level of assistance contemplated by the FCA for relator status. This action must therefore be dismissed.

An appropriate Order will issue.