# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 19, 2014 Session

## RONALD T. DAUGHERTY v. LAVADA J. DOYLE, ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 111408IV      Russell T. Perkins, Chancellor

### No. M2013-02509-COA-R3-CV - Filed November 17, 2014

A shareholder in a closely-held family business brought this action pursuant to Tenn. Code Ann. § 48-26-102(b) to inspect the company's accounting records. The trial court determined that the shareholder's request was made in good faith and for a proper purpose. On appeal, the defendants assert that the trial court erred in finding that the shareholder's request was made in good faith and in awarding him his attorney fees and the expenses he incurred in hiring a forensic accountant. We reverse the trial court's decision to award the shareholder the expenses he incurred for the forensic accountant, but remand for a determination of an award based on the accountant's fees concerning testimony about whether the records requested by Mr. Daugherty were accounting records. In all other respects, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed and Remanded in Part**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

James R. Kelley, Marc T. McNamee, and Stephen M. Montgomery, Nashville, Tennessee, for the appellants, LaVada J. Doyle, Mike Doyle, William O. Daugherty, III, and Volunteer Thread Company, Inc.

William L. Harbison and Lisa K. Helton, Nashville, Tennessee, for the appellee, Ronald T. Daugherty.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

Ronald T. Daugherty, LaVada J. Doyle, and William O. Daugherty, III, are the children of William O. Daugherty, Jr.  W.O. Daugherty, Jr., owned all of the stock in Volunteer Thread Company, Inc. ("VTC").  At her father's death in November 2008, Ms. Doyle served as the personal representative of his estate.  The VTC stock passed into the estate until it was distributed in equal shares to the three children in December 2010.

Ronald Daugherty ("Mr. Daugherty") worked at VTC for many years and states that he ran the company until the early 1980's.  In 2007, according to Mr. Daugherty, his father asked him to help out at VTC because the company was sustaining some losses.  After W.O. Daugherty, Jr.'s death, VTC asked Mr. Daugherty to continue his efforts to turn the company around.  He served as president of VTC and as a member of the board of directors until August 2009,  when he resigned. (Mr. Daugherty and Ms. Doyle gave differing testimony as to why he decided to leave the company.)  Mr. Daugherty subsequently refused requests from Ms. Doyle and others to serve on the board again.

Mr. Daugherty claims that, after he left VTC and resigned from the board, he was denied access to information regarding the company.  He filed a motion to compel in his father's estate case in November 2009, and the parties entered into an agreed order pursuant to which Ms. Doyle was required to provide certain information to Mr. Daugherty regarding VTC and Hilos, a wholly owned subsidiary of VTC, including weekly reports of financial information, monthly summaries of financial information, identities of members of the boards of directors and their compensation, minutes of the meetings of the boards of directors, and a list of persons who advised the companies. Mr. Daugherty subsequently sent letters to the board expressing his concerns about the company's significant losses and its failure to send him information.

In April 2010, Mr. Daugherty made an expression of interest to purchase VTC, and was asked by Ms. Doyle on behalf of the estate to sign a confidentiality agreement.  Ms. Doyle also made an offer to buy the company at a higher price on the same day.  Mr. Daugherty did not sign the confidentiality agreement.

On April 7, 2011, Mr. Daugherty sent VTC a records inspection request under Tenn. Code Ann. § 48-26-102.  He requested to inspect and copy the following categories of records for the time period from July 1, 2009 through March 31, 2011:

- general ledger entries;
- records of all yarn purchases (including all put up, and regardless of twist);
- origin documentation/certification for all yarn purchases from original suppliers;
- itemized detailed monthly yarn inventory;
- monthly yarn final inventory totals;
- itemized detailed monthly finished goods inventory;
- monthly final finished goods inventory;
- dye tickets (both electronic and real);
- winding tickets (both electronic and real);
- yarn transfer documents (from Mill to VTC);
- picking tickets for greige yarn to be dyed;
- historical dye house production records;
- historical lab production records;
- weekly production reports/totals for all areas;
- official Company guidelines regarding complete breakdown of all different product lines (i.e., MS, PU, VT, VC);
- official Company guidelines regarding labeling and instructions for all product lines (i.e. MS, PU, VT, VC);
- official Company guidelines regarding inventory tracking guidelines for different origin products to ensure proper usage;
- official Company guidelines regarding system of checking origin information prior to signing NAFTA certificate;
- all historical signed NAFTA certificates (from both VTC and Hilos);
- official Company guidelines regarding finished goods values by location; and
- official Company guidelines regarding official description/designation of different inventory locations.

In his letter, Mr. Daugherty, through his attorney, stated that his demand for information was made in good faith and for the purpose of helping him determine: "(1) whether the business of VTC is being properly conducted; (2) whether there has been any breach of fiduciary duty by any director or officer of VTC; and (3) the value of Mr. Daugherty's ownership interest in VTC."

On April 14, 2011, VTC's board of directors, through its attorney, responded to Mr. Daugherty's records inspection request as follows:

I am responding to your letter of April 7, 2011. I have reviewed the information requested in your letter. Your request seeks records that are beyond the scope contemplated by T.C.A. § 48-26-102(b)(2). Accordingly,

3

Volunteer Thread Company, Inc. declines to make those records available.

On October 14, 2011, Mr. Daugherty filed this action for declaratory judgment and inspection of corporate records against Ms. Doyle; Mike Doyle, her husband; W.O. Daugherty, III; and VTC. Mr. and Ms. Doyle and W.O. Daugherty, III, were members of the VTC board of directors. The complaint details Mr. Daugherty's unsuccessful efforts to obtain information from VTC and his concerns about the financial decline of the company. He asked the court to order the defendants to permit him to inspect and copy the records he requested in the April 7, 2011 letter in accordance with Tenn. Code Ann. § 48-26-102(b)(2), and to order the defendants to respond fully and completely to his requests for information concerning VTC and Hilos. Mr. Daugherty also requested an award of attorney fees and expenses.

In January 2012, Mr. Daugherty filed a motion for a forensic accounting, which was granted by the trial court. An accountant, David Wood, conducted a forensic accounting, but he was not asked to prepare a written report.

*Trial*

The case was heard in a bench trial over three days in July 2013. On day one, the court heard testimony from Mr. Daugherty. He was concerned that VTC was in trouble and wanted to get the information necessary to determine what the problems were. When asked if he was a competitor of VTC in any significant way, Mr. Daugherty testified:

A. No. We met in the marketplace just like you could say the corner market or the convenience store is competing with the convenience store across town. You're both in the convenience store business, and a customer of one may go to the other, but you're within your own market.

Q. Do you, in fact, still operate a thread business of your own?

A. I do.

Q. And what's it called?

A. Miami Thread.

Q. And did you operate Miami Thread during your father's lifetime?

A. I did.

4

Q. And was your father aware of the kind of business that you were doing through [Miami] Thread?

A. Yes. I started it while I was at Volunteer, and he knew very well I was running Volunteer. And I incorporated and started in '86 and worked for Volunteer until July 10th of 1987. And he visited me several times at the plant.

Q. I'm going to ask you straight up, Mr. Daugherty. Were you trying—by asking information about the company, were you trying to eliminate a competitor in the marketplace?

A. No. The two of us together have such a miniscule amount of the overall market share that—during my father's lifetime, we had our eyes on a bigger prize. And LaVada said as much in her deposition, when asked who were your biggest competitors, and she said American & Efird and Coats American.

. . .

Q. And is it true that you are a competitor?

A. It's only true that we meet just at the edges in the marketplace. Most of the things that I sell, the bulk of my business is Nomex and Kevlar, which is sold—it's a different family of fiber, and it's sold to—from firemen's turnout gear, it could be a pilot's flight suit. It could be someone who works on the deck of an aircraft carrier. Volunteer Thread never made any of that, didn't have the technology to make that.

On cross-examination, Mr. Daugherty asserted that it had been his father's intention to give VTC to him, but that his father had been convinced to change his will shortly before his death to divide the business equally among the three children. Mr. Daugherty felt that he had made the company profitable while his two siblings had very little or no knowledge about how to run the business.

The next witness was David Wood, a certified public accountant with a special certification in financial forensics. He was hired by Mr. Daugherty to do a forensic accounting on VTC. Mr. Wood concluded that Mr. Daugherty had a valid concern about the declined value of his asset. In analyzing the causative factors, Mr. Wood cited the fact that the company was in a difficult business, one "that has substantially gone overseas." Second, without Mr. Daugherty, VTC "had no management." Third, VTC was highly dependent on one customer, and that customer was highly dependent on one customer (Wal-Mart). Mr.

Wood questioned the timeliness of VTC's liquidation procedures and did not see any legitimate buyer wanting to acquire the company now that there were such large losses.

Mr. Wood continued to testify on day two. He opined that the company was not viable by 2012. He agreed that Mr. Daugherty had valid concerns with the position taken by VTC in 2012 that the company was viable. He testified as follows:

> I don't know of any legitimate management team that would have looked to come into that business, at least without taking a substantial portion of the ownership, because it was in a major turnaround with one major customer, a potential loss or loss of that major customer, the financial issues involved with falling revenues, et cetera, the cash loss is building up. I don't—the determination that the company was still valid in January of 2012 just doesn't make sense to me.

Mr. Wood testified about the kinds of summaries and reports that the defendants had been sending to Mr. Daugherty. He stated that these would be part of what he would call the second tier of financial statements, which would not provide a level of detail sufficient to enable a person to determine the reason for losses. From the information provided to him, Mr. Daugherty would not have been able to verify any of the numbers for accuracy or reasonableness. He could not have determined whether VTC was being properly managed.

Mr. Wood was shown the list of VTC documents Mr. Daugherty requested to inspect in his letter and then in his lawsuit. Mr. Wood explained the various levels of financial statements, beginning with summary financial statements and ending with support papers. Asked whether the documents requested by Mr. Daugherty were considered accounting records, Mr. Wood opined that they were. He further opined that there was nothing that Mr. Daugherty requested that would not be considered an accounting record.

On cross-examination, Mr. Wood recalled his deposition testimony in which he observed that the rent for the buildings used by VTC, which were owned by the siblings, was high given the company's performance.

The first witness for the defendants was Paul Gontarek, an attorney representing William O. Daugherty, III, in the estate proceedings pending in Williamson County. He also represented William O. Daugherty, III, and Ms. Doyle in two partition lawsuits regarding VTC real estate. Mr. Gontarek was asked to testify about MRK, "a company that had expressed some interest in Volunteer Thread in purchasing its assets, and it appeared to be an avenue that was worth exploring in order to try and sell the company as a going concern to MRK so that my client [W.O. Daugherty, III] would realize cash from the estate as a result

of the sale." According to Mr. Gontarek, MRK "appeared on the scene in the spring of 2010." For various reasons, the sale never happened.

Bonnie Bowman, the comptroller at VTC after the death of W.O. Daugherty, Jr., testified about the accounting system at the company and the reports she prepared for Ronald Daugherty when he was in charge of the company.

The next witness was Arthur Rebrovick, a business consultant who was hired by VTC to do an assessment of the business. He received a call in June or July of 2011 and was asked to look at three areas:

Was the business viable as we looked at it? Should the business be closed? Could the business be sold? And our basic recommendation when we came back was that the business was viable. There was no reason to close it. But if there was a concern on that, we could look at it on a very regular basis to see if something needed to be changed. And I told them, based on that very preliminary assessment, that the business should and could be sold if that's what they wanted.

Mr. Rebrovick recommended that VTC bring in an interim general manager to help find a permanent general manager. Then, they would have the option of continuing to run the business or looking for a buyer. VTC decided to hire Mr. Rebrovick as an interim general manager.

In working as the general manager, Mr. Rebrovick identified one factor as being "the real problem": the fact that the two buildings in which VTC operated were owned separately from the business; they were owned a third each by the three siblings. This meant that "the business was under what I called a 30-day out, and if one of the shareholders was trying to have the businesses removed from the facilities in 30 days . . . you could not vacate the buildings in 30 days because of the equipment, . . . you would have to shut down the business, and it was no longer a marketable business."

The following testimony by Mr. Rebrovick, concerning a meeting he had with Mr. Daugherty, is relied upon by the defendants on the issue of Mr. Daugherty's good faith:

Q. And what did he say about his siblings?
A. At one point, he said specifically that LaVada and Billy were paying blood [sic] for what they'd done.
. . .
Q. Did he talk about the will, his dad's will?

7

A. He did. He specifically said, when he referenced that they would pay in blood, that LaVada and Billy had met with their dad just prior to his death and gotten him—and as a result, [W.O. Daugherty, Jr.] changed the will.

Mr. Rebrovick testified that his meeting with Mr. Daugherty, which occurred in November 2011, changed his outlook on the future of VTC:

Because of the real estate issue and with the continued legal issues that were using cash resources and tying up time, and it ended up impacting my time as general manager more than I anticipated, it became more and more difficult to look at how the business was going to go forward. But, again, at that point in time, it was still cash-flowing, and there was still that chance, but the real estate piece was very important to it.

At a board meeting around November 2012, the board decided to have "a systematic closeout where we could make production and eventually sell everything, because we needed—what we told the board was that, if you're going to maximize your value on the equipment, you can't move it out of here in 30 days. You have to have a program. So the second part of the maximization was to—if we could run most of the raw materials through the plant, we could gain that back." By the end of February, production had stopped.

The final witness was Ms. Doyle, sister of Mr. Daugherty and W.O. Daugherty, III, and personal representative of the estate of W.O. Daugherty, Jr. Ms. Doyle testified that Mr. Daugherty's company, Miami Thread, was a direct competitor of VTC. On cross-examination, her deposition testimony from March of 2011 was read into evidence. At that time, she had stated that she was not concerned that her brother's company was a competitor of VTC. Ms. Doyle explained that she now thought that Miami Thread was a competitor of VTC because "their thread was in our biggest customer's plant."

The following deposition testimony of Ms. Doyle was also read into evidence:

Q. Miami Thread, you're not sure whether it's big small or indifferent?
A. I really don't know anything about Ronnie's company.
Q. Okay. So, whether his company was a competitor or not was not really an issue for you in terms of providing information to Ron?
A. No.
Q. It was just the policy of the company?
A. It was the policy that had been in place and the information was not sent out to anyone. They just didn't do it.
. . .

8

Q. Okay. What's your position on sharing information with Ron at this point?

A. I feel like Ronnie should serve on the Board, and then he has all the information he wants.

Q. What if he's merely a shareholder; should he be provided with that information?

A. I'm not sure.

Q. Have you thought about it?

A. No. I don't know why he would want to be a shareholder and not be on the Board.

Q. So, in your mind, you think he has a duty to be on the Board?

A. I think if he wants to complain about how things are run, he should serve on the Board and take part in how things run.

. . .

Q. Okay. So, are you telling me that if he requests information about the company now, you are not sure how you would vote, whether to provide it to him or not to provide it to him?

A. I am not sure.

*Court's decision*

In a memorandum and order, entered on August 6, 2013, the court noted that:

Contrary to Defendants' assertions, there is nothing in the statute that provides that a shareholder's statutory entitlement to accounting records can be conditioned upon the shareholder entering a confidentiality agreement. Similarly, the statute does not state that a shareholder's right to inspect corporate accounting records can be forfeited or diminished if the shareholder declines to accept a seat on the board of directors.

After reviewing Mr. Daugherty's requests to inspect documents, the reasons stated, and VTC's response, the court found that VTC's "response did not raise bad faith, lack of proper purpose, or that the records requested were not properly limited to Mr. R. Daugherty's asserted purpose. It simply stated that the requested records themselves fell outside the scope of Tenn. Code Ann. § 48-26-102(b)(2)."

The court found that the proof at trial, in particular the testimony of Mr. Wood, "established that all of the requested records were accounting records within the meaning of the statute." The court further found that the records requested "related to the purposes articulated in the April 7, 2011 request and those purposes were proper purposes within the meaning of Tenn. Code Ann. § 48-26-102."

9

The court then proceeded to consider the issue of whether the articulated purposes were a pretext for improper purposes and whether Mr. Daugherty sought the records in bad faith. The court made the following findings:

> After a review of the entire record, the Court is convinced that Mr. R. Daugherty genuinely had concerns about Volunteer Thread's financial status, the value of his interest in the business, and the need for the requested records. The concern about the company was objectively reasonable in light of Volunteer Thread's ensuing loss of revenue. Volunteer Thread's reasons for wholly denying the request, therefore, were without merit under the statute. Although the question of whether Mr. R. Daugherty was acting in good faith is a close question, the Court concludes that, more likely that not, Mr. R. Daugherty was operating in good faith in seeking the records. Although he angrily vowed in a conversation with Mr. Art [Rebrovick] that his siblings "would pay in blood," the simple truth is that Plaintiff was entitled to inspect the requested records under the statute and that his pursuit of these records was not in bad faith under the circumstances.

Based on these findings, the court concluded that Mr. Daugherty was entitled to attorney fees against VTC pursuant to Tenn. Code Ann. § 48-26-102(b)(2). The court further concluded that Mr. Daugherty was entitled to an award of attorney fees in connection with the defendants' efforts to depose plaintiff's counsel, Lisa Helton. The court found that this deposition request was unreasonable. The court gave Mr. Daugherty thirty days to file an application for attorney fees.

After a hearing on attorney fees, the court entered a final order on October 4, 2013. The court decreed that VTC "had no reasonable basis to doubt whether Plaintiff had a right to inspect the records." The court went on to find that, once Mr. Daugherty made his request, VTC should have allowed the inspection "shortly thereafter." VTC's "failure to do so led to substantial litigation expenses being incurred by the parties, particularly given Volunteer Thread's reason for not allowing the inspection." The court awarded attorney fees, forensic accounting fees ($67,034.92), and other expenses in the aggregate amount of $233,272.69 in favor of Mr. Daugherty against VTC. As to the litigation surrounding the effort to depose Ms. Helton, the court awarded attorney fees and expenses in the amount of $11,144.50 in favor of Mr. Daugherty against defendants Ms. Doyle, William O. Daugherty, III, and VTC.

*Issues on appeal*

On appeal, the defendants argue that the trial court erred (1) in finding that Mr. Daugherty acted in good faith in making the shareholder records inspection request; (2) in

holding that Mr. Daugherty was entitled to an award of attorney fees under Tenn. Code Ann. § 48-26-102(b)(2); (3) in finding that VTC had no reasonable basis to doubt that Mr. Daugherty was acting in good faith and with a proper purpose in making the shareholder records inspection request; and (4) in awarding Mr. Daugherty fees and expenses paid to the forensic accountant he hired to inspect the records. Mr. Daugherty argues that the trial court erred in applying an across-the-board twenty percent discount to the attorney fees that he incurred in this litigation when making an award of attorney fees to him.

STANDARD OF REVIEW

In a civil case tried without a jury, we review the trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d). Our consideration of the preponderance of the evidence "is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility determinations are entitled to great weight on appeal." *Rice v. Rice*, 983 S.W.2d 680, 682 (Tenn. Ct. App. 1998). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

STATUTORY FRAMEWORK

Before analyzing the issues in this case, we will set forth the relevant statutory framework.

> (b) A shareholder of a corporation is entitled to inspect and copy, during regular business hours at a reasonable location specified by the corporation, any of the following records of the corporation, if the shareholder meets the requirements of subsection (c) and gives the corporation written notice of the shareholders's demand at least five (5) business days before the date on which the shareholder wishes to inspect and copy:
> . . .
> (2) Accounting records of the corporation; and
> . . .
> (c) A shareholder may inspect and copy the records described in subsection (b) only if:
> (1) The shareholder's demand is made in good faith and for a proper purpose;
> (2) The shareholder describes with reasonable particularity the shareholder's purpose and the records the shareholder desires to inspect; and
> (3) The records are directly connected with the shareholder's purpose.

Tenn. Code Ann. § 48-26-102(b), (c). Tennessee Code Annotated section 48-26-104(c), the other provision at issue here, addresses attorney fees:

> If the court orders inspection and copying of the records demanded, it shall also order the corporation to pay the shareholder's costs (including reasonable counsel fees) incurred to obtain the order if the shareholder proves that the corporation refused inspection without a reasonable basis for doubt about the right of the shareholder to inspect the records demanded.

ANALYSIS

(1)

The defendants' first argument is that the trial court erred in finding that Mr. Daugherty acted in good faith in making the record inspection request. We must respectfully disagree.

The question of whether a party acted in good faith presents an issue of fact; issues of fact are entitled to a presumption of correctness. *Dick Broad. Co., Inc. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013); TENN. R. APP. P. 13(d). The defendants argue that the trial court failed to cite any facts to support its finding that Mr. Daugherty acted in good faith. In finding that Mr. Daugherty acted in good faith, however, the trial court did refer to facts:

> After a review of the entire record, the Court is convinced that Mr. R. Daugherty genuinely had concerns about Volunteer Thread's financial status, the value of his interest in the business, and the need for the requested records. The concern about the company was objectively reasonable in light of Volunteer Thread's ensuing loss of revenue. Volunteer Thread's reasons for wholly denying the request, therefore, were without merit under the statute. Although the question of whether Mr. R. Daugherty was acting in good faith is a close question, the Court concludes that, more likely than not, Mr. R. Daugherty was operating in good faith in seeking the records. Although he angrily vowed in a conversation with Mr. Art [Rebrovick] that his siblings "would pay in blood," the simple truth is that Plaintiff was entitled to inspect the requested records under the statute and that his pursuit of these records was not in bad faith under the circumstances.

The evidence does not preponderate against the trial court's determination that Mr. Daugherty acted in good faith in requesting to inspect the records. The court's finding of

12

good faith necessarily rests in part upon its assessment of the credibility of the witnesses. As this court stated in another case involving a determination of good faith, "[t]he weight, faith and credit to be given to any witness' testimony lies with the trier of fact and the credibility accorded will be given great weight by the appellate court." *Wood v. Lowery*, 238 S.W.3d 747, 758 (Tenn. Ct. App. 2007).

It is noteworthy that the only reason given by VTC in its letter refusing Mr. Daugherty's request to inspect the records was that they were "beyond the scope contemplated by Tenn. Code Ann. § 48-26-102(b)(2)." Tennessee Code Annotated section 48-26-102(b)(2) states that a shareholder is entitled to inspect accounting records. At trial, Mr. Daugherty put on the testimony of Mr. David Wood, a forensic accountant, who testified that all of the requested records were accounting records. The defendants did not put on any proof to rebut this evidence.

At trial, and on appeal, the defendants make several additional arguments with respect to Mr. Daugherty's good faith in making his records request. The defendants assert that Mr. Daugherty owned a business that was actively competing for VTC's customers and refused to accept any condition on his receipt of the requested records that would restrict his use of the records for competitive purposes. The defendants cite two cases, *Wood v. Myers Paper Co.*, 3 Tenn. App. 128 (1926), and *Advance Concrete Form, Inc. v. Accuform, Inc.*, 462 N.W.2d 271 (Wis. Ct. App. 1990), in support of the proposition that a shareholder "will not be permitted to inspect the corporate books and records when it appears that the inspection is for the purpose of obtaining information to be used in harming the corporation's business for the benefit of a competitor." These cases are distinguishable from the present case, however.

In *Wood*, a minority shareholder and employee of the corporation terminated his employment and opened a competing business the very next day. *Wood*, 3 Tenn. App. at 132. The shareholder made statements that he would hold on to his stock in the corporation to gain competitive advantage "in exercising his right as a stockholder to obtain information." *Id.* at 138. In the present case, there is no evidence that Mr. Daugherty retained his stock in VTC in order to compete with VTC. In his direct testimony, Mr. Daugherty was asked whether, in requesting information about VTC, he was attempting to eliminate a competitor. Mr. Daugherty responded:

> No. The two of us [VTC and Miami Thread] have such a miniscule amount of the overall market share that—during my father's lifetime, we had our eyes on bigger prizes. And LaVada said as much in her deposition, when asked who were your biggest competitors, and she said American & Efird and Coats American.

13

Moreover, in her deposition in the estate case in March 2011, less than a month before Mr. Daugherty's record inspection request in April 2011, Ms. Doyle testified that she was not concerned that Miami Thread was a competitor of VTC.

In *Accuform*, the Wisconsin Court of Appeals stated that a writ requiring a corporation to allow inspection of its books "'[would] not be denied merely because the petitioner is hostile to the respondent or because he is a member of a competing corporation.'" *Accuform*, 462 N.W.2d at 277 (quoting *State ex rel. Boldt v. St. Cloud Milk Producers' Ass'n*, 273 N.W. 603, 609 (Minn. 1937)). The court went on to state that the writ "'will not be granted where it appears that the examination is desired for the purpose of obtaining information to be used in crippling the business of the corporation for the benefit of a business rival.'" *Id.* The facts in *Accuform* showed, *inter alia,* that Advance and Accuform were "direct and fierce competitors," that the principal of Advance (the shareholder seeking inspection of the records of Accuform) stated on several occasions "that he wanted to put Accuform's principal out of business," and that Advance wooed away Accuform's only full-time sales person and thereby acquired its stock in Accuform. *Id.* The appellate court concluded that the trial court could reasonably infer from Advance's prior conduct and other facts and circumstances that the "true purpose for its inspection demand was to obtain a competitive advantage over Accuform." *Id.* at 278.

In this case, unlike in *Accuform*, Mr. Daugherty never stated that he wanted to put VTC out of business. Although there is evidence that Mr. Daugherty had hostile feelings toward his siblings over the disposition of VTC, there is ample evidence that Mr. Daugherty's purpose in seeking to inspect the records was, as he stated in his letter, to make sure the business was being properly conducted and to determine the value of his ownership interest. There was some conflicting evidence concerning the level of competition between VTC and Miami Thread and the degree to which that may have motivated Mr. Daugherty. The trial court heard all of that evidence and determined that Mr. Daugherty acted in good faith, out of genuine concern for VTC, not to gain a competitive advantage.

We find no merit in the defendants' argument that Mr. Daugherty exhibited a lack of good faith in refusing to sign a confidentiality agreement as a condition of receiving the records he requested in April 2011. At the time when Mr. Daugherty made his request to inspect the records, the defendants did not ask him to sign a confidentiality agreement. Rather, it was one year earlier, in April 2010, that the defendants asked Mr. Daugherty to sign a confidentiality agreement. At that time, he made an expression of interest to buy VTC; that same day, Ms. Doyle made an expression of interest to purchase the company at a higher price. Mr. Daugherty did not sign the confidentiality agreement. That agreement would only have allowed him to inspect VTC's monthly profit and loss statements and balance sheets for the months of August 2009 through March 2010. In light of the fact that the defendants did not ask Mr. Daugherty to sign a confidentiality agreement as a condition to allowing him

14

access to the accounting documents he first requested in April 2011, we reject their confidentiality argument.

The defendants' next argument regarding good faith is that Mr. Daugherty unilaterally attempted to evict VTC from its leased real property on short notice on three occasions. According to the defendants, Mr. Daugherty's actions "are inconsistent with those of a person who is acting in good faith to learn more about VTC and protect it from potential mismanagement." Rather, they assert, Mr. Daugherty's actions are "consistent with those of a person who was intent on destroying VTC as quickly as possible because he did not believe that he should have to share it with his siblings."

The timing of the various legal actions at issue is important. In June 2010, Mr. Daugherty filed a partition action concerning the real property owned as tenants in common by Mr. Daugherty, Ms. Doyle, and William O. Daugherty, III. He voluntarily dismissed the action in September 2010. At trial, Mr. Daugherty testified that this action was not aimed at evicting VTC; he noted that a new owner could lease the property to VTC. After Mr. Daugherty dismissed his action, Ms. Doyle and William O. Daugherty, III, filed a partition action. Mr. Rebrovick testified that the ownership of the real property by the three siblings made the ongoing viability or sale of the business less certain. At the time of Mr. Daugherty's request for inspection of VTC records, the only litigation pending between the parties was the estate.

After VTC refused his inspection request, Mr. Daugherty demanded that VTC vacate the parcels of real property and subsequently filed detainer actions against VTC. VTC successfully opposed these attempts by Mr. Daugherty.

The trial court heard all of this evidence and, despite the obvious hostility harbored by Mr. Daugherty toward his siblings, concluded that he acted in good faith in making the inspection request. *See Accuform*, 462 N.W.2d at 277 (Writ requiring a corporation to allow inspection of its books "'[would] not be denied merely because the petitioner is hostile to the respondent or because he is a member of a competing corporation.'"); *State ex rel. Watkins v. Cassell*, 294 S.W.2d 647, 654 (Mo. Ct. App. 1956) ("The mere fact that a stockholder seeking inspection is on unfriendly terms with the officers and is also a stockholder in a rival or competing corporation is not, apart from improper motives, grounds for denying his right of inspection."). The evidence does not preponderate against that finding.

The defendants further argue that Mr. Daugherty was already receiving much of the same information he requested in the records inspection request through the agreed order in the estate case. The records Mr. Daugherty received under the agreed order were:

15

1. Weekly reports of financial information in the form regularly prepared by the companies;
2. Monthly summaries of financial information in the form regularly prepared by the companies;
3. Identities of the members of the boards of directors and their compensation if any;
4. Minutes of the meetings of the boards of directors; and
5. A list of persons who advise the companies.

When Mr. Daugherty entered into this agreed order, the estate was the sole shareholder of VTC and, thus, he himself was not a shareholder. Once he became a shareholder, Mr. Daugherty was entitled to inspect the accounting records and other records described in Tenn. Code Ann. § 48-26-102(b), which include more than just the summaries and reports listed in the agreed order. Two of the purposes asserted by Mr. Daugherty for his record inspection request were to determine whether VTC was being properly run and to evaluate the value of his ownership interest in VTC. Mr. Wood testified that the summaries supplied under the agreed order would not give Mr. Daugherty the level of detail necessary for him to understand why the company was sustaining significant losses or to determine whether it was being properly managed. He further testified that the information provided under the agreed order would not enable Mr. Daugherty to verify the accuracy or reasonableness of the numbers in the summaries. The information provided under the agreed order is not a substitute for the information requested by Mr. Daugherty under Tenn. Code Ann. § 48-26-102.

For all of these reasons, we find that the evidence does not preponderate against the trial court's finding that Mr. Daugherty acted in good faith in making his request for inspection of records pursuant to Tenn. Code Ann. § 48-26-102.

(2)

The defendants assert that the trial court erred in holding that Mr. Daugherty was entitled to an award of attorney fees under Tenn. Code Ann. § 48-26-102. The defendants' argument here seems to be that the trial court ordered attorney fees based solely upon a finding that Mr. Daugherty acted in good faith and with a proper purpose under Tenn. Code Ann. § 48-26-102. We disagree with this interpretation of the trial court's decision.

In its memorandum and order entered on August 6, 2013, the trial court found that Mr. Daugherty acted in good faith in seeking the requested records. The court went on to state: "Consequently, Mr. R. Daugherty is entitled to an award of reasonable attorneys' fees and expenses against Volunteer Thread under Tenn. Code Ann. § 48-26-102(b)(2)." Taken out

16

of context, this statement could be construed to mean that the attorney fee determination has been made. The remainder of the memorandum and the final order, however, show this interpretation to be erroneous. The court gives the plaintiff thirty days to make an application for an award of attorney fees and the defendants twenty days to respond.

Tennessee Code Annotated sections 48-26-104(b) and (c) provide:

> (b) If a corporation does not within a reasonable time allow a shareholder to inspect and copy any other record, the shareholder *who complies with § 48-26-102(b) and (c)* may apply to the court of record having equity jurisdiction . . . for an order to permit inspection and copying of the records demanded. . . .
> (c) If the court orders inspection and copying of the records demanded, it shall also order the corporation to pay the shareholder's costs (including reasonable counsel fees) incurred to obtain the order *if the shareholder proves that the corporation refused inspection without a reasonable basis for doubt about the right of the shareholder to inspect the records demanded.*

(Emphasis added). From this statutory framework, it is possible to see how the trial court, in its memorandum, might move to the issue of attorney fees after concluding that Mr. Daugherty met the requirements of Tenn. Code Ann. §§ 48-26-102(b) and (c). In its final order, the trial court clearly addressed the key issue required by Tenn. Code Ann.§ 48-26-104(c): "Defendant Volunteer Thread Company, Inc. ("Volunteer Thread") had no reasonable basis to doubt whether Plaintiff had a right to inspect the records."

We find no error in the trial court's statutory analysis.

(3)

The defendants' next argument is that the trial court erred in finding that VTC had no reasonable basis to doubt that Ronald Daugherty was entitled to inspect the requested records. As discussed above, this finding is required for an award of attorney fees under Tenn. Code Ann. § 48-26-104(c).

The award of attorney fees is within the trial court's discretion and will not be overturned absent an abuse of discretion. *Wright ex rel. Wright v. Wright,* 337 S.W.3d 166, 176 (Tenn. 2011). In reviewing the award, we look at the evidence in the light most favorable to the trial court's decision. *Id.* Thus, we are required to uphold the trial court's ruling "as long as reasonable minds could disagree about its correctness," and "we are not permitted to substitute our judgment for that of the trial court." *Caldwell v. Hill,* 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007).

17

The defendants argue that the trial court's finding that VTC had no reasonable basis to doubt that Mr. Daugherty was entitled to inspect the records was "directly contradictory" to its previous findings that "it was a 'close question' and only 'more likely than not' that Ronald Daugherty acted in good faith." In maintaining that Mr. Daugherty failed to prove that VTC had no reasonable basis to doubt that he was entitled to inspect the records, the defendants rely on the same arguments used to assert that Mr. Daugherty did not act in good faith—including that Mr. Daugherty was a competitor of VTC, that he would not sign a confidentiality agreement, that he tried to have VTC evicted, and that he made statements reflecting his hostility toward his siblings.

As set forth above, the abuse of discretion standard does not allow this court to substitute our judgment for that of the trial court. We are required to uphold the trial court's decision "as long as reasonable minds could disagree" about the correctness of the decision. *Id.* We find no basis upon which to conclude that the trial court abused its discretion in determining that Mr. Daugherty was entitled to an award of attorney fees pursuant to Tenn. Code Ann. § 48-26-104(c).

(4)

The defendants' final argument is that the trial court erred in awarding Mr. Daugherty fees and expenses he paid to the forensic accountant he hired to inspect the records. In its final order, the court concluded that "the expenses incurred for the work of the forensic accountant is fully compensable in the amount of $67,034.92." We have concluded that the defendants have the better argument on this issue.

Mr. Daugherty makes two main arguments to justify the award of his expenses in hiring the forensic accountant. First, he asserts that Mr. Wood, the accountant, was a court-appointed expert witness compensable under Tenn. R. Evid. 706(b). The record does not support this assertion. Mr. Daugherty filed a motion for a forensic accounting, and the court granted the motion, authorizing an accountant hired by Mr. Daugherty to have access to VTC's books and to perform a forensic accounting. Nowhere in the court's order was the forensic accountant classified as a court-appointed expert, and the court did not follow the procedures set forth under Tenn. R. Evid. 706 for the court appointment of an expert. Moreover, Mr. Daugherty filed a motion to quash to prohibit the defendants from taking Mr. Wood's deposition on the basis that he was a consulting expert under Tenn. R. Civ. P. 26.02(4)(B).

Mr. Daugherty's second argument is that Mr. Wood was an expert witness regarding whether the records requested by Mr. Daugherty were accounting records. Under Tenn. Code Ann. § 48-26-104(c), a shareholder is entitled to recover costs (including reasonable

18

attorney fees) "*incurred to obtain the order* if the shareholder proves that the corporation refused inspection without a reasonable basis for doubt . . . ." (Emphasis added). We must determine whether the statute authorizes the recovery of Mr. Wood's forensic accounting fees in this case.

The construction of a statute is a question of law. *Lee v. Franklin Special Sch. Dist. Bd. of Educ.*, 237 S.W.3d 322, 332 (Tenn. Ct. App. 2007). The standard of review is de novo. *Id.* In construing Tenn. Code Ann. § 48-26-104(c), we apply these well-settled principles articulated by our Supreme Court:

> The leading rule governing our construction of any statute is to ascertain and give effect to the legislature's intent. To that end, we start with an examination of the statute's language, presuming that the legislature intended that each word be given full effect. When the import of a statute is unambiguous, we discern legislative intent "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning."

*Myers v. AMISUB (SFH), Inc.*, 382 S.W.3d 300, 308 (Tenn. 2012) (citations omitted).

The key statutory language here is that the costs must be "incurred to obtain the order." There are no Tennessee cases interpreting this statutory language. Mr. Daugherty argues that Mr. Wood was an expert witness regarding whether the records requested by Mr. Daugherty were accounting records. More specifically, he maintains that, because the defendants denied his inspection request, he "had no choice but to engage an accountant to study the requested records, determine whether they were accounting records, and ultimately testify at trial . . . ." He relies on the case of *Shell v. King*, No. E2003-02124-COA-R3-CV, 2004 WL 1749186 (Tenn. Ct. App. Aug. 5, 2004), to support his position that the statute contemplates that costs include expert witness fees.

While we agree that costs may include expert witness fees under Tenn. Code Ann. § 48-26-104(c), we do not find that Mr. Wood's fees fit the statutory requirements in this case. The *Shell* case addresses expert witness fees in the context of an action for dissolution pursuant to Tenn. Code Ann. § 48-245-903, a statute which allows for the award of reasonable attorney fees and costs to the prevailing party. *Shell*, 2004 WL 1749186, at *8. That statute does not contain the key language limiting the award of costs to those "incurred to obtain the order." Tenn. Code Ann. § 48-26-104(c). Thus, we find *Shell* to be distinguishable.

Tennessee Code Annotated section 48-26-104(c) is part of the Tennessee Business

Corporation Act, Tenn. Code Ann. §§ 48-11-101– 48-27-103, and codifies a version of the Model Business Corporation Act's shareholder inspection rights. *See* Browning Jeffries, *Shareholder Access to Corporate Books and Records: The Abrogation Debate*, 59 DRAKE L. REV. 1087, 1110 n.131 (2011). The defendants cite a case from Georgia, a state which has enacted a version of the Model Business Corporation Act's shareholder inspection rights provision similar to Tennessee's.[1]

In the Georgia case, *G.I.R. Systems, Inc. v. Lance*, 466 S.E.2d 597, 598 (Ga. Ct. App. 1995), a shareholder requested corporate records for the purpose of helping him assess the value of his stock. The appellate court affirmed the trial court's finding that the shareholder was seeking the records for a proper purpose. *G.I.R. Sys.*, 466 S.E.2d at 599. The trial court ordered that the shareholder's certified public accountant ("CPA") be permitted to inspect the records and ordered the corporation to pay half of the accountant's fee to inspect the records. *Id.* at 599-600. On appeal, the corporation argued that the trial court erred in requiring it to split the cost of the shareholder's CPA inspection of the corporate records. *Id.* at 600. In concluding that the trial court exceeded its authority, the appellate court reasoned, in part, as follows: "This section [Ga. Code Ann. § 14-2-1604(c)] is clearly inapplicable as the costs assessed to G.I.R. [the corporation] were not costs incurred by Lance [the shareholder] in obtaining the inspection order." *Id.*

We cannot agree with Mr. Daugherty's position that a full forensic accounting was necessary for him to obtain the records he requested. The testimony he adduced from Mr. Wood concerning whether the records he requested qualified as accounting records was limited to going over the list of the records he requested and asking Mr. Wood whether those types of documents qualified as accounting records. The forensic accounting conducted by Mr. Wood, for which Mr. Daugherty sought reimbursement, was designed to determine how the company was being run and whether there was mismanagement. Tennessee Code Annotated section 48-26-104(c) does not contemplate a shareholder being paid for such costs because they were not incurred to obtain the order to inspect the records requested. Mr.

---

[1]Georgia's provision states:

> If the court orders inspection and copying of the records demanded, it shall also order the corporation to pay the shareholder's costs (including reasonable attorneys' fees) *incurred to obtain the order* unless the corporation proves that it refused inspection in good faith because it had a reasonable basis for doubt about the right of the shareholder to inspect the records demanded.

Ga. Code Ann. § 14-2-1604(c) (emphasis added). Although the Georgia statute puts the burden of proof on the corporation, while the Tennessee statute puts the burden of proof on the shareholder, this difference is not significant for purposes of the present analysis.

Daugherty is only entitled to be paid for the cost of Mr. Wood's testimony concerning whether the records requested by Mr. Daugherty were accounting records.

(5)

Mr. Daugherty's final argument is that the trial court erred in allowing defendants a 20% discount regarding the attorney fee award.

In its final order, the court stated:

The Court concludes that the services captured in the portion of Plaintiff's request for attorneys' fees that is not related to Defendant's effort to depose Ms. Helton [one of plaintiff's attorneys] were reasonable and necessary. The Court awards the full amount requested ($196,474.75) minus 20% ($39,294.95) for a total of $157,179.80, taking into account duplication of effort. There were instances when one lawyer could have readily handled certain matters and there were instances when the time spent on a particular matter by both counsel could have been less extensive in the exercise of discretion and/or billing judgment.

Mr. Daugherty argues that he attempted to keep attorney fees down but that the defendants' aggressive litigation of the case drove the costs up. The reasons given by the court, however, are not reflective of the length or complexity of the litigation, but of instances when the court saw duplication of effort on the part of Mr. Daugherty's attorneys. As stated above, our standard of review with respect to attorney fees is the abuse of discretion standard. We find no basis upon which to conclude that the trial court abused its discretion in applying a discount with respect to attorney fees.

Furthermore, we decline to grant Mr. Daugherty's request for an award of attorney fees on appeal.

CONCLUSION

For the foregoing reasons, we reverse the trial court's decision with respect to the award of forensic accounting costs; in all other respects, we affirm the judgment of the trial court. The case is remanded for the trial court to determine how much of the cost of the forensic accounting is attributable to Mr. Wood's testimony concerning whether the records

21

requested by Mr. Daugherty qualified as accounting records.  Costs of the appeal are assessed against the appellants.

_____
ANDY D. BENNETT, JUDGE